## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JOHN J. ANCZARSKI, as biological parent of
John R. Anczarski, deceased, and as Personal
Representative for the Estate of John R.
Anczarski, and JOYCE A. ANCZARSKI,
biological parent of John R. Anczarski,
deceased,

      Plaintiffs,

vs.                                                                          No. CIV 16-0856 JB/SCY

THE TRAVELERS INDEMNITY COMPANY,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's The Travelers
Indemnity Company's Motion for Summary Judgment, filed April 6, 2017 (Doc. 31)("Motion");
and (ii) the Plaintiffs' Motion to Supplement the Record with Correct Information, filed June 28,
2017 (Doc. 46)("Motion to Supplement Record"). The Court held a hearing on June 8, 2017.
The primary issues are: (i) whether the Plaintiffs John J. Anczarski and Joyce A. Anczarski may
supplement the record with the Certificate of Liability Insurance 2010 (executed January 2,
2010), filed April 36, 2017 (Doc. 46-1)("2010 Certificate of Liability Insurance"), and John J.
Anczarski's Amended Verification (sworn January 4, 2017), filed June 28, 2017 (Doc. 46-
2)("Amended Verification"), where the Anczarskis inadvertently had filed an immaterial
Certificate of Liability Insurance 2004 (executed December 8, 2004), filed April 26, 2017 (Doc.
35-1)("2004 Certificate of Liability Insurance") that reflects Travelers Indemnity Company
policies and where the Anczarskis inadvertently omitted to file a verification in support of John
J. Anczarski's Supplemental Answers to Defendant's First Set of Interrogatories, filed April 26,

2017 (Doc. 35-3)("John J. Anczarski's Supplemental Answers"); (ii) whether Pennsylvania or New Mexico law applies to the Anczarskis' breach-of-contract claim and uninsured or underinsured motorist claim against Travelers Indemnity, where Travelers Indemnity issued two insurance policies to Mark's Supply, which is a hardware store in Pennsylvania that the Anczarskis own, but where their son was fatally struck by a vehicle in New Mexico; and (iii) whether, in light of The Travelers Indemnity Company Certified Common Policy at 1-145, filed April 6, 2017 (Doc. 31-1)("Travelers CGL Policy"), and The Travelers Indemnity Company Certified Commercial Excess Liability (Umbrella) Insurance Policy at 1-40, filed April 6, 2017 (Doc. 31-2)("Travelers Excess Liability Policy"), which Travelers Indemnity issued to the Anczarskis, there is a genuine issue of material fact regarding the Anczarskis' breach-of-contract claim and uninsured or underinsured motorist claim that precludes Travelers Indemnity from seeking summary judgment.  The Court concludes: (i) that the Anczarskis may supplement the record to include the 2010 Certificate of Liability Insurance, and John J. Anczarski's Amended Verification in support of his Supplemental Answers; (ii) that under New Mexico's lex loci contractus choice-of-law rule, Pennsylvania contract law applies to the Anczarskis' breach-of-contract claim and uninsured or underinsured motorist claim, because the commercial general liability and excess liability policies at issue were executed in Pennsylvania; and (iii) that, in light of the Travelers CGL Policy and the Travelers Excess Liability Policy at issue, there is no genuine issue of material fact whether Travelers Indemnity had an obligation to provide uninsured or underinsured motorist coverage to the Anczarskis or otherwise breached any contractual obligation owed to the Anczarskis under either insurance contract.  Accordingly, the Court: (i) grants the Anczarskis' Motion to Supplement Record, (ii) grants Travelers Indemnity's Motion, and (iii) enters summary judgment in Travelers Indemnity's favor.

## FACTUAL BACKGROUND

The Court draws its presentation of the facts from: (i) Travelers Indemnity's Statement of Material, Undisputed Facts, see Motion ¶¶ 1-16, at 3-6; and (ii) the Anczarskis' Statement of Undisputed Facts, see Plaintiff's [sic] Response to Defendant's Motion for Summary Judgment at 2, filed April 26, 2017 (Doc. 35)("Response"). "John R. Anczarski, the son of Plaintiffs John J. Anczarski and Joyce A. Anczarski, died after being struck by a vehicle during a bicycle ride across the country for breast cancer awareness." Motion ¶ 1, at 4 (stating this fact)(citing Plaintiff's Complaint for Underinsured/Uninsured Motorist Claim ¶¶ 3, 13, at 2-3 (filed in state court on June 17, 2016), filed in federal court on July 26, 2016 (Doc. 1-1)("Complaint")). See Response at 2 (not disputing this fact). "The bicycle ridden by the son was struck by a vehicle driven by Gilbert Waconda in Cibola County, New Mexico." Motion ¶ 2, at 4 (stating this fact)(citing Complaint ¶ 4, at 2). See Response at 2 (not disputing this fact). "Waconda's negligence caused the collision and the death of the son." Motion ¶ 3, at 4 (stating this fact)(citing Complaint ¶¶ 11-12, at 2). See Response at 2 (not disputing this fact).

"Plaintiffs John J. Anczarski and Joyce Anczarski are residents of Pennsylvania and own and operate a business in Pennsylvania known as Mark's Supply." Motion ¶ 4, at 4 (stating this fact)(citing Complaint ¶¶ 1, 5, at 2). See Response at 2 (not disputing this fact). "Mark's Supply is a sole proprietorship owned by the Anczarskis or by John J. Anczarski." Motion ¶ 5, at 4 (stating this fact)(citing Complaint ¶ 5, at 2; John J. Anczarski's Answers to Defendant's Second Set of Interrogatories ¶ 17, at 5 filed April 6, 2017 (Doc. 31-5)("John Anczarski's Second Interrogatory Answers"). See Response at 2 (not disputing this fact). "John J. Anczarski is the personal representative for the Estate of John R. Anczarski." Motion ¶ 6, at 4 (stating this fact)(citing Complaint at 1). See Response at 2 (not disputing this fact).

"At the time of the collision and death of the son, there were in effect a commercial general liability ('CGL') policy and a commercial excess liability policy issued by the Travelers Indemnity Company to 'Mark's Supply' as the named insured."  Motion ¶ 7, at 4 (citing Joint Status Report and Provisional Discovery Plan, Stipulations ¶ 3, at 2, filed September 27, 2016 (Doc. 13)("Joint Status Report Stipulations")(asserting this fact).  See Response at 2 (not disputing this fact).  "The CGL policy and commercial excess liability policy were the only Travelers policies in effect at the time of the accident for any of the Anczarskis or Mark's Supply."  Motion ¶ 8, at 4 (citing Joint Status Report Stipulations ¶ 4, at 3)(asserting this fact). See Response at 2 (not disputing this fact).  Travelers issued a "commercial general liability ('CGL') policy . . . to Mark's Supply as the named insured in Frackville, Pennsylvania."  Motion ¶ 9, at 5 (citing Travelers CGL Policy at 1-145)( asserting this fact).  See Response at 2 (not disputing this fact).  Travelers issued "commercial excess liability policies . . . to Mark's Supply as the named insured at 1 S. Lehigh Ave., Frackville, Pennsylvania."  Motion ¶ 10, at 5 (citing Travelers Excess Liability Policy at 1-40)(asserting this fact).  See Response at 2 (not disputing this fact).  "The Travelers CGL and commercial excess liability policies were issued in the State of Pennsylvania to Mark's Supply as the named insured at 1 S. Lehigh Ave., Frackville, Pennsylvania."  Motion ¶ 11, at 5 (citing Travelers CGL Policy at 1-145; Travelers Excess Liability Policy at 1-40)(asserting this fact).  See Response at 2 (not disputing this fact).  "The CGL policy and the commercial excess liability policy were both issued for the policy period of 12-25-09 to 12-25-10, which included the date of the accident in this case."  Motion ¶ 12, at 5 (citing Travelers CGL Policy at 1-145; Travelers Excess Liability Policy at 1-40)(asserting this fact).  See Response at 2 (not disputing this fact).

"At the time of the collision and death of the son, Mark's Supply Company did not own, title or register any motor vehicles." Motion ¶ 13, at 5 (citing John Anczarski's Second Interrogatory Answers ¶ 14, at 5; John J. Anczarski's Objections and Responses to Defendant's Second Set of Requests for Production ¶¶ 11-12, at 9, filed April 6, 2017 (Doc. 31-5). See Response at 2 (not disputing this fact). "Mark's Supply Company did not own, title or register any vehicles at any time from the year 2000 to the present." Motion ¶ 14, at 5 (citing John Anczarski's Interrogatory Answers ¶ 16, at 5). See Response at 2 (not disputing this fact). "At the time of the accident and death of the son, the Anczarskis were insured under a motor vehicle liability insurance policy issued by Erie Insurance Exchange that contained uninsured/underinsured motorist coverage." Motion ¶ 15, at 5-6 (citing John J. Anczarski's Answers to Defendant's Interrogatories ¶ 5, at 3, filed April 6, 2017 (Doc. 31-6)("John Anczarski's Interrogatory Answers"); Erie Insurance Group Policy and Declarations at 1-23, filed April 6, 2017 (Doc. 31-3). See Response at 2 (not disputing this fact). "The Anczarskis made an underinsured motorist claim to Erie Insurance for the death of their son, which claim was paid by Erie Insurance." Motion ¶ 15, at 6 (John Anczarski's Interrogatory Answers ¶ 5, at 3; Erie Insurance Exchange/Eire Insurance Company Release and Agreement at 4-5, filed April 6, 2017 (Doc. 31-4)). See Response at 2 (not disputing this fact). On December 8, 2004, Seabury & Smith, Inc. issued Mark's Supply a Certificate of Liability Insurance, under which The Travelers Indemnity Company provided Mark's Supply with coverage for commercial general liability, automobile liability for hired autos and non-owned autos, and excess liability, for the period commencing on December 25, 2004, and terminating on December 25, 2005. See Response at 3 (asserting this fact); Reply at 3 (not disputing this fact); 2004 Certificate of Liability Insurance.

## PROCEDURAL BACKGROUND

On June 17, 2016, the Anczarskis filed the Plaintiff's [sic] Complaint for Underinsured/Uninsured Motorist Claim (filed in state court on June 17, 2016), filed in federal court on July 26, 2016 (Doc. 1-1)("Complaint"), in which they alleged a claim "under the Underinsured/Uninsured Motorists provision" of certain Travelers Indemnity's business and automobile policies. Complaint ¶ 16, at 3. The Anczarskis seek "relief, general and special, at law or in equity, to which [they] are entitled including punitive damages, hedonic and all damages that Plaintiffs would be entitled to receive under New Mexico law." Complaint at 3. Under 28 U.S.C. §§ 1332, 1441 & 1446, Travelers Indemnity filed a Notice of Removal, filed July 26, 2016 (Doc. 1)("Notice of Removal").

The Anczarskis responded to Travelers Indemnity's Notice of Removal. See Plaintiff's [sic] Response Motion to Defendant's Notice of Removal, filed August 15, 2016 (Doc. 7)("Response to Notice of Removal"). The Anczarskis argue that Travelers Indemnity's removal defectively alleges grounds for diversity jurisdiction, because Travelers Indemnity did not "allege its principal place of business" and the Anczarskis alleged that Travelers Indemnity's principal place of business is located in Pennsylvania, the state of which the Anczarskis are citizens. Response to Notice of Removal ¶ 3, at 2. Travelers Indemnity sought leave to amend its Notice of Removal. See Defendant's Motion to Amend Notice of Removal to Cure Defect in Allegations as to Principal Place of Business of Defendant at 1-7, filed August 16, 2016 (Doc. 8). The Court granted that motion. See Order Granting Motion to Amend Notice of Removal, filed November 21, 2016 (Doc. 23).

On November 21, 2016, Travelers Indemnity filed an Amended Notice of Removal, filed November 21, 2016 (Doc. 24)("Amended Notice of Removal"), in which Travelers Indemnity

conceded that, in its Notice of Removal, it inadvertently omitted its principal place of business. See Amended Notice of Removal at 3. Travelers Indemnity corrected this omission, indicating that its principal place of business is Hartford, Connecticut. See Amended Notice of Removal ¶ 8, at 3 (citing Affidavit of Jonathan A. Decker in Support of Motion to Amend Notice of Removal ¶ 3, at 1 (executed August 16, 2016), filed August 16, 2016 (Doc. 8-1)("The Travelers Indemnity Company has its principal place of business in Hartford, Connecticut.")).

The Anczarskis then filed two motions to amend the Complaint. On December 5, 2016, the Anczarskis filed Plaintiffs [sic] Motion to Amend the Complaint and Join Additional Parties, filed December 5, 2016 (Doc. 25)("First Motion to Amend"). Then, on April 6, 2017, the Anczarskis filed Plaintiffs [sic] Stipulated Motion to Amend the Complaint and Join Additional Parties, filed April 6, 2017 (Doc. 32)("Second Motion to Amend"). In these motions, the Anczarskis seek to join "Hudson Insurance Company, Tribal Nation Insurance Services and Gilbert Waconda, in his Official Capacity" as Defendants. First Motion to Amend at 1. See Second Motion to Amend at 1. Travelers did not oppose the Anczarskis' motions to amend to join additional parties. See Second Motion to Amend at 2 ("Defendant's attorney did contact Counsel for Plaintiffs on December 13, 2017 and informed her that he did not oppose the filing of the Amended Complaint."); Draft Transcript of Motion Proceedings at 2:24-3:3, taken June 8, 2017 ("Tr.")[1](Court, Eaton)(Court: "I think there is a motion to amend the complaint and to join additional parties. It looked to me like that one was unopposed." Eaton: "Yes, Your Honor."). At the hearing the Anczarskis represented to the Court that they would not "join any additional parties." Tr. at 3:6-7 (Aragon). The Anczarskis maintained, however, their interest "in

---

[1]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

amending the complaint," presumably to add either a breach-of-contract claim against Travelers Indemnity or a negligence claim against Travelers Indemnity's insured, Mark's Supply.  Tr. at 3:7-8 (Aragon).    See  Plaintiff's  Amended  Complaint  for  Breach  of  Contract  and Underinsured/Uninsured Motorist Claim ¶ 9, at 3, filed December 5, 2016 (Doc. 21-1)("Amended Complaint")(alleging that "Mark's Supply failed to research and plan the best route for the bicycle route").  The Court stated that the Anczarskis need not "file another motion" but only "a notice withdrawing" that part of the Motion to Amend to Join Additional Parties.  Tr. at 3:15-17 (Court).  See Tr. at 3:25-42 (Court).  The Anczarskis have yet to file a notice withdrawing their intention to add additional party Defendants.

### 1.    Travelers Indemnity's Motion.

Travelers   Indemnity   moves   for   summary   judgment   on   the   Anczarskis' uninsured/underinsured motorist claim, because Travelers Indemnity "did not issue any policy of motor vehicle liability insurance to Plaintiffs that would provide coverage for the death of the Plaintiff's son caused by the negligence of an underinsured motorist."  Motion at 1.  Travelers Indemnity argues that, because it "did not issue a policy of motor vehicle liability insurance, it was not required to and did not offer uninsured/underinsured motorist ('UM/UIM') coverage to Plaintiffs or their business, Mark's Supply."  Motion at 1.  Travelers Indemnity also argues that it "was not required to offer UM/UIM coverage under the commercial excess policy and general commercial liability ('CGL') policy that Travelers Indemnity had issued to Mark's Supply."  Motion at 1.  In sum, Travelers Indemnity argues that the Court should grant summary judgment in its favor, because: (i) "Travelers did not issue a motor vehicle liability policy"; and (ii) "there is no UM/UIM coverage in either the commercial general liability policy or umbrella policy that were issued by Travelers to Mark's Supply."  Motion at 3.

- 8 -

Travelers Indemnity indicates that there "were only two Travelers policies in existence for either Mark's Supply or the Anczarskis at the time of the accident and death of John J. Anczarski -- an excess liability policy and a commercial general liability policy."  Motion at 6 (citing Travelers CGL Policy at 1-145; Travelers Excess Liability Policy at 1-40).  Travelers Indemnity maintains that the commercial general liability policy "provided business[]owners property coverage and commercial general liability coverage," containing "an 'each occurrence' limit of $1 million."   Motion at 6 (citing Travelers CGL Policy at 1-145).  Travelers Indemnity also asserts that "the declarations do not list any vehicles as insured under the policy."  Motion at 6.  Turning to the excess liability policy, Travelers Indemnity argues that "[t]here is no indication that this . . . policy is anything other than an excess or umbrella policy that could provide liability coverage above certain specified underlying liability coverage."  Motion at 7 (citing Travelers Excess Liability Policy at 1-40).  Travelers Indemnity also maintains that excess liability policy "specifically excludes coverage for any liability under any UM/UIM laws."  Motion at 7 (citing Travelers Excess Liability Policy at 11).

Travelers Indemnity next addresses which law the Court should apply when interpreting the two insurance policies at issue.  See Motion at 8-9.  Travelers Indemnity states that the Court, when sitting in diversity, applies New Mexico choice-of-law principles to determine which state's substantive law to apply.  See Motion at 8 (citing Sellers v. Allstate Ins. Co., 82 F.3d 350, 352 (10th Cir. 1996)).  Travelers Indemnity then states:

> Generally, in New Mexico, "in determining the appropriate law to apply when an accident occurs in one state and an insurance contract has been entered in another, the law of the place of the accident applies to determine the plaintiff's right to determine the plaintiff's right to recover from the negligent party, and the law of the place of the contract, the *lex loci contractus*, applies to interpret the terms of the contract."

Motion at 8 (quoting Wilkerson v. State Farm Mutual Auto. Ins. Co., 2014-NMCA-077, ¶ 5, 329

P.3d 749, 750 (citing State Farm Auto. Ins. Co. v. Ovitz, 1994-NMSC-047, ¶ 8, 873 P.2d 979)).

Travelers Indemnity then argues that Pennsylvania law applies to the two insurance policies at

issue, because the "policies were issued in Pennsylvania to Mark's Supply, a sole proprietorship

owned and operated in Pennsylvania by Pennsylvania residents John J. and Joyce Anczarski at a

Pennsylvania address."  Motion at 8 (citing Travelers CGL Policy at 1-145; Travelers Excess

Liability Policy at 1-40).

Travelers Indemnity also argues that "Pennsylvania's statutes and case law that limit the

requirement to offer UM/UIM coverage to a motor vehicle policy do not conflict in any way with

New Mexico law or public policy," because, like Pennsylvania law, "New Mexico's

uninsured/underinsured motorist statute specifically applies only to a 'motor vehicle or

automobile liability policy' that is delivered or issued in New Mexico."  Motion at 9 (quoting

N.M. Stat. Ann. § 66-5-301).  "Under both statutes," Travelers contends, "the obligation to over

UM/UIM coverage applies only [to] a motor vehicle liability policy." Motion at 9 (alteration

added)(internal quotation marks omitted).   Therefore, Travelers Indemnity argues, the

application of Pennsylvania would not "'result in a violation of fundamental principles of justice'

of New Mexico[,]" thereby, under New Mexico choice-of-law principles, requiring the

application of New Mexico law.  Motion at 9 (quoting State Farm Mut. Auto. Ins. Co. v. Ballard,

2002-NMSC-30, ¶ 9, 54 P.3d 537).  Travelers Indemnity additionally notes that Pennsylvania

and New Mexico law are in accord, because, like in Pennsylvania, "New Mexico courts have

held that the UM/UIM statute does not extend its reach beyond a motorist's primary automobile

liability insurance policy."  Motion at 9 (citing Archunde v. Intl. Surplus Lines Ins. Co., 1995-

NMCA-110, 905 P.2d 1128)).  Accordingly, Travelers Indemnity concludes that "Pennsylvania

law would apply to insurance contracts issued to Pennsylvania residents in the State of Pennsylvania." Motion at 9.

Travelers Indemnity then turns to its substantive argument that there is no viable underinsured/uninsured motorist claim for the death of John. R. Anczarski under the two Travelers Indemnity policies. See Motion at 10. Travelers Indemnity notes that, under Pennsylvania law, "'[i]n actions arising under an insurance policy . . . it is a necessary prerequisite for the insured to establish that his claim falls within the coverage provided by the insurance policy.'" Motion at 10 (alterations added)(quoting Peters v. Nat'l Interstate Ins. Co., 108 A.3d 38, 43 (Pa. Super. Ct. 2014))(citing McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. Ct. 2013)). Travelers Indemnity consequently states that, "[i]n order to make out a valid UM/UIM claim, it must be established that the injured person qualified as an insured under the UM/UIM coverage in question." Motion at 10. Travelers Indemnity argues that, in this case, "there is no allegation that the son was an insured under the CGL and excess liability policies issued to Mark's Supply." Motion at 10. Travelers Indemnity further maintains that "[t]here is no allegation that Travelers provided a motor vehicle liability insurance policy to Mark's Supply." Motion at 11 (alteration added). Travelers Indemnity further asserts that "[t]here is no allegation that [it] was required to offer UM/UIM coverage in excess or commercial general liability policies." Motion at 11 (alterations added). Consequently, Travelers Indemnity concludes that "there are no allegations in Plaintiff's Complaint . . . to support the element of any perceived UM/UIM claim." Motion at 11 (alteration added).

Travelers Indemnity next argues that Pennsylvania law "[d]id [n]ot and [d]oes [n]ot" require that it offer uninsured or underinsured motorist coverage under a commercial general liability or excess liability policy. Motion at 11 (alterations added). Travelers Indemnity adverts

to Title 17, §1731 of the Pennsylvania Consolidate Statutes, which requires insurers offering motor vehicle liability insurance policies to also offer uninsured motorist and underinsured motorist coverage.  See Motion at 11 (citing 17 Pa. Const. Stat. §1731 (1994)).  Travelers Indemnity states that, at the time of the accident, Erie Insurance had issued to the Anczarskis a motor vehicle liability policy containing uninsured or underinsured motorist coverage.  See Motion at 11.  Travelers Indemnity also maintains that it did not "issue a motor vehicle liability policy, because Mark's Supply did not own or operate any motor vehicle at the time of this accident or for many years prior to the accident."  Motion at 11.

Travelers Indemnity next states that, under Pennsylvania law, neither a commercial general liability policy nor an excess liability policy is a "motor vehicle liability policy" that implicates an insurer's requirement to offer uninsured or underinsured motorist coverage. Motion at 11.  See Motion at 12-13 (citing Northern Ins. Co. of N.Y. v. Dottery, 43 F. Supp. 2d 509, 513 (E.D. Pa. 1998)(Robreno, J.); Lonesathirath v. Avis Rent A Car Sys. Inc., 937 F. Supp. 367 (E.D. Pa. 1995)(Padova, J.); Stoumen v. Pub. Serv. Mut. Ins. Co., 834 F. Supp. 140 (E.D. Pa. 1993)(Hutton, J.); Been v. Empire Fire and Mar. Ins. Co., 751 A.2d 238 (Pa. Super. Ct. 2000); Ranocchia v. Erie Ins., No. 2166-MDA-2015, 2016 WL 5418191 (Pa. Super. Ct. Aug. 19, 2016)).  Travelers Indemnity notes that New Mexico courts have reached the same conclusion. See Motion at 13 (citing Pielhau v. RLI Ins. Co., 2008-NMCA-099, 189 P.3d 687, overruled on other grounds by Progressive N.W. Ins. Co. v. Weed Warrior Services, 2010-NMSC-050, 245 P.3d 1209; Archunde v. Intl. Surplus Lines Ins. Co., 1995-NMCA-110, 905 P.2d 1128)).

Travelers Indemnity presses that, in this case, "the Store PAC policy clearly is labeled as including commercial general liability coverage and not motor vehicle liability coverage." Motion at 13 (internal quotation marks omitted)(citing Travelers CGL Policy at 1-145).

Travelers Indemnity emphasizes that "[n]o vehicles are listed on the CGL declarations." Motion at 13 (citing Travelers CGL Policy at 1-145). "The named insured is Mark's Supply," Travelers Indemnity states, and Mark's Supply "did not own any vehicles and had not owned any vehicles in many years." Motion at 13. Turning to the excess liability policy, Travelers Indemnity asserts that it "specifically excludes coverage under any UM/UIM laws." Motion at 13 (citing Travelers Excess Liability Policy at 11). Travelers Indemnity again maintains that the excess liability policy "does not list any vehicles on the declarations, nor does it contain any other features of a motor vehicle liability policy." Motion at 13. Accordingly, Travelers Indemnity concludes that it "was not required under Pennsylvania law (or under New Mexico law) to offer UM/UIM coverage to Mark's Supply, and its policies do not provide such coverage." Motion at 14.

Last, Travelers Indemnity argues that, if the Anczarskis intend to allege a negligence claim against Mark's Supply, the applicable statute of limitations bars such claim. See Motion at 14. Travelers Indemnity states that John R. Anczarski was involved in an accident occurring on June 21, 2010, and died on June 22, 2010. See Motion at 14. Travelers Indemnity then argues that the "New Mexico statute of limitations for personal injuries or wrongful death ran out at least by 2013." Motion at 14 (citing N.M. Stat. Ann. §§ 37-1-8, 41-2-2). Travelers Indemnity additionally maintains that, "[u]nder Pennsylvania law . . . the statute of limitations for a wrongful death and survival action is two years." Motion at 14 (citing 42 Pa. Const. Stat. § 5524 (2001); Krapf v. St. Luke's Hospital, 4 A. 3d 642 (Pa. Super. Ct. 2010)). Travelers Indemnity concludes that the negligence claim that the Anczarskis seek to bring against its insured, Mark's Supply, is futile. See Motion at 14.

2.     **The Anczarskis' Response**.

The Anczarskis argue that the Court should deny summary judgment in Travelers Indemnity's favor.  See Response at 1.  The Anczarskis maintain that "they should recover from Travelers for the death of their son pursuant to the contractual provisions and/or uninsured/underinsured motorist coverage provided by [Travelers Indemnity]."  Response at 1 (alterations added).   The Anczarskis argue that Travelers Indemnity "did insure Mark's Supply under an automobile liability policy for hired and non-owned automobiles."  Response at 1.

In their Response, the Anczarskis decline to cite any Pennsylvania law.  See Response at 1-10.  Rather, they exclusively rely on New Mexico cases.  See Response at 4-10 (citing Gov't Emps. Ins. Co. v. Welch, 2004-NMSC-014, 90 P.3d 471; Ponder v. State Farm Mut. Auto. Ins. Co., 2000-NMSC-033, 12 P.3d 960).  The Anczarskis state that to exclude the injuries pertaining to John R. Anczarski's death from coverage under either the commercial general liability policy or the excess liability policy "would be against New Mexico public policy."  Motion at 10.

Turning to their substantive argument, the Anczarskis contend that, under both the commercial general liability policy and the excess liability policy, they should recover from Travelers Indemnity for the death of their son.  See Motion at 3-10.  The Anczarskis argue that the commercial general liability policy lists "hired auto and non-owned auto liability coverage . . . contrary to the defendant's claim that Travelers did not issue any policy of motor vehicle liability insurance."  Motion at 3 (citing Travelers CGL Policy at 1-145).  Turning to the excess liability policy, the Anczarskis argue that, under that policy, "an insured is defined as 'anyone using an auto you own, hire or borrow.'"  Motion at 3 (citing Travelers Excess Liability Policy at 12).  See Motion at 10 (citing Travelers Excess Liability Policy at 12).  The Anczarskis contend that "[t]heir son was 'anyone' using such an auto."  Motion at 10.  Accordingly, the

Anczarskis reasons that the decedent, John R. Anczarski, "was an insured according to the provisions of the policies . . . ."  Motion at 4.  Further, the Anczarskis contend that the excess liability policy covers the injuries related to John R. Anczarski's death, because the excess liability policy not only includes "death within the definition of bodily injury," but also states that it "'applies to bodily injury or property damage from the ownership, operation and use of an auto.'"  Motion at 3 (quoting Travelers Excess Liability Policy at 20).  Furthermore, the Anczarskis reason that the insurance policies that Travelers issued to Mark's Supply include the damage resulting from the John R. Anczarski's death, because John R. Anczarski was "using a motor vehicle owned and registered to his father, John J. Anczarski, who loaned him the vehicle, sponsored and supported his ride across America . . . under the purview of the business, Mark's Supply."  Motion at 4.

The Anczarskis next contend that "[t]he auto provisions as provided in the [excess liability] policy conflict with the provision that excludes coverage for liability [for] uninsured/underinsured motorist coverage."  Motion at 3 (alterations added).  They note that "several separate sections of the Plaintiff's policy conflict with one another."  Motion at 7.  The Anczarskis compare the 2004 Certificate of Liability Insurance, "which certifies coverage for automobile accidents involving hired or nonowned vehicles with a liability limit of $1,000,000," Motion at 7 (citing 2004 Certificate of Liability Insurance at 1), against their excess liability police, which "unambiguously excludes uninsured and underinsured motorist coverage," Motion at 7 (citing Travelers Excess Liability Policy at 1-40).  In light of this alleged discrepancy, the Anczarskis argue "that the mere fact their umbrella policy does not include or does exclude UM and/or UIM coverage is not in and of itself determinative against them," because the Anczarskis' "umbrella policy in question includes coverage for motor vehicle accidents in excess of the limits

required by law." Motion at 5 (citing 2004 Certificate of Liability Insurance at 1). To bolster

their argument that the Travelers' policies are ambiguous, the Anczarskis advert to John J.

Anczarski's Supplemental Answers ¶ 12, at 3.[2] At John J. Anczarski states:

> I am not able to recall specific details of discussions that I had with the Traveler's
> [sic] Indemnity Company that occurred years ago. I do contend that my purpose
> in buying insurance from Traveler's [sic] would have been to ensure that Mark's
> Supply was fully covered by insurance that would have protected Mark's Supply
> and my family. So I contend that I would have made this clear to whomever I
> spoke with at The Traveler's [sic] Indemnity Company. I contend that the reasons
> that I purchased the insurance coverage would have been based on the assurances
> from the Traveler's [sic] Indemnity Company that they were providing us with
> full insurance coverage to include uninsured/underinsured motorist coverage.

Response at 7 (citing John J. Anczarski's Supplemental Answers ¶ 12, at 3). As a result, the

Anczarskis contend that "[t]here is clearly a genuine issue of material fact[] and the Defendant is

not entitled to a Judgment in their favor as a matter of law." Motion at 10. Accordingly, the

Anczarskis conclude that the Court should deny the Motion. See Motion at 10.

### 3. **Travelers Indemnity's Reply**.

In reply, Travelers Indemnity states that the Anczarskis "fail to identify a single word,

sentence, paragraph or provision in either Travelers policy that provides uninsured ('UM') or

underinsured ('UIM') motorist coverage." The Travelers Indemnity Company's Reply to

Plaintiffs' Response to Motion for Summary Judgment at 1, filed May 9, 2017 (Doc.

38)("Reply"). Travelers Indemnity also maintains that the Anczarskis "fail to identify any

contractual provisions of either liability policy that would provide coverage for the death of their

son caused by a third party." Reply at 1 (internal quotation marks omitted). Accordingly,

Travelers Indemnity concludes that the Anczarskis "have failed to controvert the undisputed

---

[2]John J. Anczarski's Supplemental Answers are unverified. See John J. Anczarski's
Supplemental Answers at 4 (lacking John J. Anczarski's and a Notary Public's signature). On
June 28, 2017, the Anczarskis filed an Amended Verification that corresponds to John J.
Anczarski's Supplemental Answers.

evidence that neither policy contains UM/UIM coverage or any other provisions that would provide coverage here." Reply at 1.

Travelers Indemnity notes that the Anczarskis "point out that the Travelers CGL policy contained an endorsement that could cover Mark's Supply Company for liability for injuries caused by Mark's Supply's use of nonowned or hired autos." Reply at 1. Travelers Indemnity emphasizes, however, that "Plaintiffs offer no facts or arguments as to how that endorsement would apply." Reply at 2. Travelers Indemnity notes that "Mark's Supply is not named as a defendant and has never been sued for causing or contributing to the death of John R. Anczarski." Reply at 2.

Travelers Indemnity next turns to the Anczarskis' assertion that "one or both liability policies issued by Travelers to Mark's Supply Company contain UM/UIM coverage or that the liability coverages somehow apply . . . ." Reply at 4. Travelers Indemnity maintains that the Anczarskis "fail to point to any UM/UIM coverage provisions in either liability policy, other than an exclusion for UM/UIM benefits in the umbrella liability policy." Reply at 5. Travelers Indemnity notes the Anczarskis' observation that the commercial general liability policy "contains an endorsement entitled 'Hired Auto and Nonowned Auto Liability.'" Reply at 5 (citing Travelers CGL Policy at 1-145). Travelers Indemnity additionally notes the Anczarskis' observation of "provisions in the umbrella policy that refer to auto liability coverage if the underlying policy provides auto liability coverage." Reply at 5. Travelers Indemnity emphasizes, however, that the Anczarskis do not "explain how or why [auto] liability coverage would apply here." Reply at 5 (alteration added).

Travelers Indemnity next walks through the commercial general liability policy that it issued to Mark's Supply. See Reply at 7. Travelers Indemnity explains that the commercial

general liability policy "provides that: 'We [Travelers Indemnity] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."   Reply at 5 (alteration original)(quoting Travelers CGL Policy at 95).   Travelers Indemnity explains that "if the insured, Mark's Supply, caused bodily injury to which the policy applied, it would provide coverage for Mark's Supply for such liability . . . ."  Reply at 5.  Travelers Indemnity argues that this provision is inapplicable, stating that "[n]either the Plaintiffs nor their business, Mark's Supply, are defendants, nor have they ever been sued for the death of John R. Anczarski . . . ."  Reply at 5.

Travelers Indemnity then addresses the commercial general liability policy's "'Hired Auto and Nonowned Auto Liability Endorsement.'"  Reply at 5 (quoting Travelers CGL Policy at 21).  Travelers Indemnity explains that "[t]he endorsement expands the liability coverage of the CGL policy to apply to bodily injury 'arising out of the maintenance or use of a hired auto or nonowned auto.'"  Reply at 5 (alteration added)(quoting Travelers CGL Policy at 21).  "[I]f Mark's Supply caused bodily injury arising out of Mark's Supply's use of a 'hired auto' or 'nonowned auto,'" Travelers reasons, "coverage may apply."   Reply at 5 (alteration added)(quoting Travelers CGL Policy at 21).  Travelers Indemnity argues that "[t]here is no evidence that Mark's Supply was using a vehicle that it hired, rented or borrowed or that was being used in the course of Mark's Supply's business, or that any such vehicle caused or contributed to the death of John R. Anczarski."  Reply at 6.  Travelers Indemnity contends that the Anczarskis'

> Response nowhere suggests Plaintiffs are alleging that they, as the owners of Mark's Supply Company, should be liable for the death of their son.   No suit has ever been filed against Mark's Supply Company or the Anczarskis for the death of their son.  Even if such a claim were to be made now or in the future, it would be barred by the applicable statutes of limitations . . . .

Reply at 6.  In sum, Travelers Indemnity argues that the endorsement does not apply, not only because a "hired or nonowned auto did not cause or contribute to the death of John R. Anczarski," but also because "there is and has never been a suit or claim that the Plaintiffs, through their business Mark's Supply, caused bodily injuries to the death of John R. Anczarski through the use of a hired or nonowned auto."  Reply at 6.  Accordingly, Travelers Indemnity concludes that "the CGL policy, even with the Hired and Nonowned Auto Liability endorsement, simply does not provide coverage for the Plaintiffs' claims that a third party caused the death of John R. Anczarski."  Reply at 7.

Travelers Indemnity next addresses the excess liability policy's references to auto liability.  See Reply at 7-9.  Travelers Indemnity notes the Anczarskis' observation that "the umbrella policy contains an 'Auto Liability - Following Form' and that the definition of insured includes 'anyone using an auto you own, hire or borrow.'"  Reply at 7 (quoting Travelers Excess Liability Policy at 12, 20).  Travelers Indemnity indicates that the excess liability policy's auto liability provision applies "to liability for bodily injury arising out of the use of any auto, but only if such bodily injury 'would be covered by underlying insurance shown in Item 6 SCHEDULE OF UNDERLYING INSURANCE of the Declarations . . . .'"  Reply at 7 (quoting Travelers Excess Liability Policy at 20).  Travelers Indemnity then states that "Item 6, [in] the Schedule of Underlying Insurance, shows the CGL policy as the underlying policy."  Reply at 7 (citing Travelers Excess Liability Policy at 20).  Travelers Indemnity explains that, as a result of these provisions, "for the umbrella policy to apply, the underlying CGL policy must provide liability coverage for the bodily injury."  Reply at 7.  Travelers then reemphasizes that "there is and has never been a claim or lawsuit against the insured, Mark's Supply, for the death of John

R. Anczarski, nor is there any evidence to suggest that an auto used by Mark's Supply caused the death of the son." Reply at 7.

Travelers Indemnity also replies to the Anczarskis' contention that their son, John R. Anczarski, is an insured under the excess liability policy. See Reply at 7. Travelers Indemnity states that, "[w]ith regard to the definition of insured in the umbrella liability policy, the policy does not define insured, with respect to the auto hazard, as anyone using an auto you own, hire or borrow . . . ." Reply at 7 (internal quotation marks omitted)(citing Travelers Excess Liability Policy at 12). Travelers Indemnity explains that "the insuring agreement of the umbrella policy, similar to the CGL policy, provides liability coverage for an amount 'which the insured becomes legally obligated to pay as damages because of bodily injury . . . to which this insurance applies." Reply at 7 (alteration original)(quoting Travelers Excess Liability Policy at 7). Travelers Indemnity again restates that "[n]o vehicle that Mark's Supply owned, hired or borrowed caused or contributed to the death of John R. Anczarski," and, accordingly, concludes that "there is no basis for any liability coverage to apply in this case." Reply at 8.

Travelers Indemnity next turns to the Anczarskis' reliance on the 2004 Certificate of Liability Insurance and their corresponding Anczarskis' argument that Travelers Indemnity's insurance policies are somehow ambiguous or in conflict. See Reply at 8-9. Travelers Indemnity asserts that the 2004 Certificate of Liability Insurance is an unverified "2004 certificate of liability insurance for a policy period in 2004-2005." Reply at 8 (citing 2004 Certificate of Liability Insurance at 1). Accordingly, Travelers Indemnity asserts that the 2004 Certificate of Liability Insurance "has no applicability to the instant case." Reply at 8 (citing 2004 Certificate of Liability Insurance at 1).

Travelers Indemnity then addresses the Anczarskis' reliance on John J. Anczarski's Supplemental Answers ¶ 12, at 3, and the Anczarskis' related argument that the coverage included within the Travelers Indemnity's policies is ambiguous. See Reply at 8. Travelers Indemnity notes that, under Pennsylvania law, a "court may consider the 'reasonable expectations of the insured' when interpreting an ambiguous contract." Reply at 8 (quoting Nationwide Mut. Co. v. Nixon, 682 A.2d 1310, 1313 (Pa. Super. Ct. 1996)). "However," Travelers Indemnity emphasizes, "'[w]hen the language [of the contract] is clear and unambiguous, [a] court is required to give effect to that language.'" Reply at 8 (first alteration original, second and third alterations added)(quoting Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)). Travelers Indemnity also maintains that "[t]he parties' reasonable expectations remain 'best evidenced by the language of the insurance policy[.]'" Reply at 8-9 (second alteration original, first alteration added)(quoting Allstate Ins. Co. v. McGovern, No. 07-2486, 2008 WL 2120722, at *2 (E.D. Pa. May 20, 2008)(Kelly, J.)). Travelers Indemnity maintains that the Anczarskis "do not point to any ambiguities in the insurance policies themselves, nor are any apparent." Reply at 9. "Simply put," Travelers Indemnity states "there is nothing in either the CGL liability policy or the umbrella liability policy that would suggest that either policy contains UM/UIM coverage. In fact, the umbrella liability policy contains a clear exclusion of UM/UIM coverage. Plaintiffs have offered not authority or reasons why the exclusion is not valid." Reply at 9 (citation omitted). Travelers yet again presses that "Mark's Supply did not own any vehicles, and the Anczarskis did have motor vehicle liability coverage and UM/UIM coverage for their vehicles through a different insurer." Reply at 9.

Last, Travelers Indemnity contends that the Anczarskis do not state that Travelers Indemnity was required to provide uninsured or underinsured coverage. Reply at 9-11. Travelers Indemnity notes that the Anczarskis do not dispute Travelers Indemnity's contention that, under Pennsylvania law, "an insurer under an umbrella policy or commercial liability policy is not obligated to offer UM/UIM coverage." Reply at 9. See Reply at 10 (citing Mulford v. Altria Grp., 242 F.R.D. 615, 622 n.5 (D.N.M. 2007)(Vasquez, J.)("Failure to respond to an argument is generally deemed an acquiescence."); D.N.M.LR-Civ. 7.1(b)("The failure of a party to file and serve a response in opposition to a motion . . . constitutes consent to grant the motion.")(alteration added)). Rather, according to Travelers Indemnity, the Anczarskis "allege that the CGL policy and umbrella liability policy somehow provide coverage for injuries caused not by fault of the insured but by the negligence of a third party." Reply at 9. Travelers Indemnity replies that "neither the Travelers CGL policy nor the umbrella policy provides uninsured/underinsured motorist coverage or even mentions such coverage, other than the umbrella policy expressly excludes such coverage." Reply at 10 (citing Travelers Excess Liability Policy at 11). Further, Travelers Indemnity maintains that "[i]t is absolutely clear under both Pennsylvania and New Mexico law that an insurer under an excess or umbrella policy is not required to offer UM/UIM coverage." Reply at 11 (citing Northern Ins. Co. of N.Y. v. Dottery, 43 F. Supp. 2d 509, 513 (E.D. Pa. 1998)(Robreno, J.); Archunde v. Intl. Surplus Lines Ins. Co., 1995-NMCA-110, 905 P.2d 1128)). Travelers Indemnity concludes that the Anczarskis

> do not claim that UM/UIM coverage should have been offered. They do not point the Court to any provisions of either liability policy that provide UM/UIM coverage. They do not explain how liability coverage would apply when the acts of a negligent third party, nor the acts of an insured, caused the bodily injuries.

Reply at 11. Accordingly, Travelers Indemnity requests the Court to enter summary judgment in its favor.

4. **The Hearing.**

The Court held a motion hearing on June 8, 2017. See Tr. at 1:22 (Court). Regarding the Motion, the Court began by asking the Anczarskis for their "best theory . . . against Travelers as to why they should pay." Tr. at 4:6-7 (Court). The Anczarskis replied that Travelers Indemnity issued a "certificate of liability insurance," which "indicates that there is a commercial liability and general liability policy." Tr. at 5:7-9 (Aragon). "[U]nder the general liability policy," the Anczarskis maintain, "there is an auto, nonowned auto provision that specifically indicates that they would be covered for a certain amount [because] at [that] point in time, Mr. Anczarski owns Mark's Supply." Tr. at 5:10-14 (Aragon)(alterations added). The Anczarskis further stated the decedent was riding his bicycle in support of "a nonprofit that was funded and sponsored by Mark's Supply." Tr. at 5:16-17 (Aragon). "The vehicle that was used during that trip," the Anczarskis additionally asserted, "was owned by Mr. Anczarski." Tr. at 5:17-18 (Aragon). The Anczarskis concede that Mark's Supply did not own the bicycle that the decedent was riding when the injury occurred, but argue that "the provisions indicate that there is at least cover[age] under the bodily injury provision and is insured pursuant to the . . . owned car policy." Tr. at 5:20-23 (Aragon)(alterations added).

The Court expressed some skepticism of the Anczarskis' argument:

[I]f you were just to walk up and say to me we're talking about the nonowned provision of the general commercial liability policy, this is what I would think [we] would be . . . talking about[:] if Mr. Anczarski's company went out and bought, you know was using, say, a U-Haul vehicle or they rented a tractor or rented some equipment that would not be owned by the company but it would still provide some coverage if they were using it. Digging a hole, digging a ditch, driving something around and they hit somebody. That would be what I would think it would be. But this situation is that their son was hit by somebody else's vehicle so I'm having a hard time figuring out how the policy here would cover this incident rather than it being some other policy, the policy of the driver here, would be the one that's covering.

- 23 -

Tr. at 5:25-6:16 (Court)(alteration added).  The Court then asked the Anczarskis to respond to its

impression.  See Tr. at 6:16 (Court).

> The Anczarskis responded by emphasizing Mark's Supply's sponsorship of the bike ride:
>
> > [M]ark's Supply sponsored the bike ride.  They provided the vehicles[;] they
> > provided the insurance[;] they provided the gas[;] they paid for the trip[;] the paid
> > for the stickers[;] they paid for the equipment[;] they maintained [the]
> > vehicle[; . . .] and they used . . . the advertisement of this with stickers on their
> > website.  So they were involved in promoting this. . . .  Mark's Supply was behind
> > it.

Tr. at 6:18-7:1 (Aragon)(alterations added).   The Court conveyed that it understood "the

connection between the bike ride and the company."  Tr. at 7:4-5 (Court).  The Court indicated

that it was "struggling with the insurance policy, how, where the nonowned vehicle is."  Tr. at

7:5-7 (Court).  The Court explained that it was "trying to figure out how that came into play here

as far as the accident."  Tr. at 7:7-9 (Court).

> The Anczarskis responded that "the vehicle itself was not involved in the accident."  Tr.

at 7:10-11 (Aragon).  The Anczarskis explicated: "Johnny Anczarski was not hit by that vehicle.

That vehicle was what they call a chaser vehicle that was used in the bike rides [that] went along

with them, was the one[] that carried the supplies, worked along with them."  Tr. at 7:11-15

(Aragon)(alterations added).  The Anczarskis then pivoted to the crux of their argument.  See Tr.

at 7:16-8:1 (Aragon)

> > I'm basing it based on the fact that there is ambiguity in regards to the insurance
> > policy.  The ambiguity states that underinsured, uninsured is excluded.  However
> > the other policies indicate[] that Johnny was an insured and that he was also
> > covered.  So I'm basing it on the fact that there [are] those requirements [and] that
> > ambiguity in regards to the case and that if there is ambiguity it goes in favor of
> > the party.

Tr. at 7:16-8:1 (Aragon)(alterations added).  The Court interjected, inquiring whether "that [is]

your biggest or best theory or is that your only theory that it comes within the nonowner

coverage of the general commercial policy?   Is that the ball game, deciding whether that coverage is available?"   Tr. at 8:2-7 (Court)(alteration added).   The Anczarskis answered that "the injury is covered in that . . . .   [S]o based on that, yes . . . , all including that as the primary argument."   Tr. at 8:8-12 (Aragon)(alterations added).   The Court then asked Travelers Indemnity for its argument.   <u>See</u> Tr. at 13-16 (Court).

Travelers began by reviewing the policies that it issued to Mark's Supply.   <u>See</u> Tr. at 8:24-9:11 (Eaton).

> So there were two policies issued by Travelers that were in effect at the time of this accident there.   [One] was [a] business owner's policy that included the commercial general liability policy.   And the endorsement that y'all were talking about is part of that CGL policy.   Then there is a separate umbrella policy.   Both of these are liability policies.   So neither policy mentions uninsured motorist coverage. . . .   [The] umbrella policy has a specific exclusion for uninsured motorist coverage.   But there are no provisions in either policy that look like uninsured motorist coverage or purport to provide any uninsured motorist coverage.

Tr. at 8:24-9:11 (Eaton).   The Court then asked for clarification whether the Anczarskis were "trying to get uninsured motorist coverage."   Tr. at 9:17-18 (Court).   "Does that come from the complaint," the Court inquired.   Tr. at 9:18-19 (Court).

Travelers Indemnity explained: "Judge, it comes from the title of the complaint and from the title of this proposed amended complaint.   But I agree, if you read the body of the complaint or the body of the proposed amended complaint it's not so clear."   Tr. at 9:20-24 (Eaton). Travelers Indemnity then provided its best interpretation of the Anczarskis' underinsured or uninsured motorist claim.   <u>See</u> Tr. at 9:25-10:11 (Eaton).

> So the complaint is titled plaintiff's complaint . . . underinsured/uninsured motorist claims, and then the relevant parts of the complaint are . . . paragraph 7, the son was operating a [bicycle] under the policies issued by Travelers.   Mark's Supply was insured by Travelers, . . . [and] entitled to recover from Travelers the maximum     amount     recoverable     under     the     respective     policies     of

> insurance . . . . [T]he complaint says plaintiffs are entitled to recover under the
> uninsured/underinsured provision of the Travelers indemnity policy . . . .

Tr. at 9:25-10:11 (Eaton).  The Court interjected: "[A]nd you're telling me there is just

not one there."  Tr. at 10:11-12 (Court).  Travelers Indemnity responded in the

affirmative and rehearsed the main of their argument.  See Tr. at 10:13-11:6 (Eaton).

> There is not an uninsured motorist policy.  There is simply not and in the facts the
> plaintiffs haven't disputed the facts so I think the facts are clear.  But so if we're
> talking about the liability policies and . . . specifically this nonowned auto
> endorsement.  I mean they both are liability policies.  And the umbrella policy
> only applies if the underlying [policy] applies.  So [the] liability policy would
> protect Mark's Supply and its owners and employees, et cetera, if they injured
> somebody and were sued because of those injuries, I mean that's obviously what
> the liability policies do.  And . . . Mark's Supply did not injury anybody, and the
> plaintiffs did not injure their son.  And they have never been sued for the death of
> young Mr. Anczarski.  And there is no claim against Mark's Supply or any of the
> Travelers insureds that they should be held liable for causing injuries to their son.

Tr. at 10:13-11:6 (Eaton).  Travelers Indemnity further argued that "there can't be" a claim

against Mark's Supply to recover for injuries relating to John R. Anczarski's death.  Tr. at 11:7

(Eaton).  Travelers Indemnity noted: "This accident happened in 2010.  New Mexico has a three-

year statute of limitations.  Pennsylvania, where all of the insurance transactions occurred, has I

believe a two-year statute of limitations.  So, there is simply no legal way that today Mark's

Supply and Mr. and Mrs. Anczarski could be sued . . . ."  Tr. at 11:8-13 (Eaton).  The Court

asked whether any claims had been filed against Mark's Supply or the Anczarskis.  See Tr. at

11:15 (Court).   "They haven't been yet," Travelers Indemnity replied, elaborating that "they're

not defendants in this case or any other case."  Tr. at 11:18 (Eaton).  Travelers Indemnity stated

that, "in terms of a liability policy[,] . . . it doesn't apply."  Tr. at 11:19-20 (Eaton).  Travelers

Indemnity explained that "the policy kicks in when there is an action against the insured and the

policy provides that a defense will be provided, and the insurance company will indemnify

assuming its covered.  But there has got to be a claim, a lawsuit, something against the insureds.

And here there is simply not." Tr. at 12:6-11 (Eaton). The Court then asked whether the Anczarskis were "trying to bring in the company with any of these amended motions." Tr. at 12:12-13 (Court). Travelers Indemnity replied in the negative. See Tr. at 12:14 (Eaton). Travelers Indemnity concluded that "just on the basis of the undisputed facts on the pleadings there is nothing here to which a liability policy would apply." Tr. at 12:22-25 (Eaton). Travelers Indemnity then offered to address "the uninsured motorist claim if there is such a claim." Tr. at 12:25-13:1 (Eaton).

The Court then asked the Anczarskis whether they "are trying to make at this point any sort of uninsured motorist claim or is that dropped out." Tr. at 13:10-12 (Court). The Anczarskis replied that they "are trying to make an underinsured/uninsured motorist claim." Tr. at 13:13-14 (Aragon). The Anczarskis then offered their argument for that claim. See Tr. at 13:15-14:15 (Aragon).

> Although it specifically states there is an exclusion there are other provisions in the policy that create confusion as to what is covered under nonowned and owned auto liability. Although it falls under the general liability insurance and it's not specifically stated and checked as automobile liability insurance, it says auto owned and not owned within that policy under the general liability policy. And our argument is that if there is ambiguity in regards to what is covered in regards to underinsured and uninsured that if there is any ambiguity in the policies . . . as to what is covered, what's not covered, and saying underinsured and uninsured is not covered here . . . it creates confusion . . . and the case law does specifically state that when there is confusion and ambiguity that there is a material issue of . . . material fact.

Tr. at 13:15-14:15 (Aragon). The Court confirmed that the Anczarskis' underinsured or uninsured motorist claim was "still in the case." Tr. at 14:17 (Court). The Court then asked for Travelers Indemnity's argument. See Tr. at 14:18 (Eaton).

Travelers Indemnity stated that "the commercial general liability policy that contains the nonowned auto endorsement . . . doesn't have any uninsured motorist provisions in it . . . I mean

it's purely a liability policy." Tr. at 14:20-24 (Eaton)(alterations added). Travelers Indemnity asserted that "[t]he endorsement that [the Anczarskis] refer[] to is purely a liability endorsement. . . . If Mark's Supply borrowed a car, hired a car, rented a car and injured somebody, that endorsement . . . provide[s] liability protection if they were sued by the injured party." Tr. at 14:24-15:5 (Eaton)(alterations added). Travelers Indemnity argued that this policy "has nothing to do with uninsured motorist coverage." Tr. at 15:5-6 (Eaton). Travelers Indemnity then pivoted to the Anczarskis' ambiguity argument. See Tr. at 15:7-16:12 (Eaton).

> I don't know where the ambiguity is. [The Anczarskis] didn't point out anywhere that there was an ambiguity. . . . [The Anczarskis] attached a certificate of liability insurance that wasn't prepared by Travelers. It was prepared we don't know by whom from 2004. And that showed that there was automobile liability coverage. And [the Anczarskis] argued that that certificate showing auto liability coverage created an ambiguity with this 2010 policy. But that certificate . . . was five years previous. . . . [It] doesn't have anything to do with this policy. I think what we can see from the documents is that Mark's Supply had auto liability coverage, and maybe uninsured motorist coverage through Travelers back in 2004 and 2005. What we then can see . . . [is] an email from an agent that, in 2009 and it says something like . . . Travelers is going to issue both policies. So somewhere between 2004 when Mark's Supply may have been covered by Travelers for auto liability, commercial general liability and umbrella, somewhere between then and 2010, they switched their auto liability coverage to Erie Exchange. And in fact in this case they made a UM claim to Erie Exchange and got paid on that claim. So it seems clear that the insureds Mark's Supply and the Anczarskis had auto coverage, and at one point it was with Travelers, but five years before this accident they switched that auto coverage to an entirely different insurance company.

Tr. at 15:7-16:12 (Eaton)(alterations added). The Court then asked: "So this policy just simply doesn't have the uninsured motorist coverage?" Tr. at 16:13-14 (Court). Travelers Indemnity responded that not only "[i]t doesn't have the uninsured coverage," Tr. at 16:15 (Eaton), but also it did not understand the Anczarskis references to "ambiguities," Tr. at 16:18 (Eaton).

The Court then asked the Anczarskis "what would you point to . . . in the commercial general liability policy . . . [where] you see uninsured motorist coverage or anything that you

[are] claiming is uninsured motorist coverage." Tr. at 17:4-9 (Court)(alterations added). In

positing the question, the Court also referenced the exclusion of uninsured or underinsured

motorist coverage in the excess liability policy. See Tr. at 18:4-5 (Court). The Anczarskis stated

that they "have a certificate of liability insurance policy effective 12/25/2009 to

12/25/2010 . . . ." Tr. at 18:18-20 (Aragon)(alteration added). The Court suggested: "Let's put

aside the certificates. What about the policy itself. Is there something in the CGL that you're

thinking provides uninsured or underinsured motorist coverage?" Tr. at 18:23-25 (Court). The

Anczarskis responded: "I'm thinking under the hired [auto] and the nonowned auto . . . ." Tr. at

19:2-3 (Aragon)(alteration added).

      Travelers Indemnity then replied to the Anczarskis' reference to the hired and nonowned

auto endorsement provisions. See Tr. at 19:5-19:20 (Eaton).

> [T]hat's a very short endorsement. . . . It does what we're saying it does[:] it
> provides liability coverage to Mark's Supply for liability that may be assessed
> against Mark's Supply for causing bodily injury . . . [by a] nonowned or hired
> auto. It simply doesn't apply to the facts of this case . . . . [T]he guys [on] the
> bicycle ride were using a van that Mr. Anczarski personally lent to his son and the
> other folks . . . that van had nothing to do with this accident. It wasn't involved in
> any way. So had the van injured somebody else it would be a whole different
> story. . . . But that's not what happened.

Tr. at 19:5-19:20 (Eaton)(alterations added). Travelers Indemnity accordingly expressed its

puzzlement regarding the hired and nonowned auto endorsement. See Tr. at 20:7-8 (Eaton).

      The Anczarskis addressed their assertion that the Travelers insurance policy documents

contain an ambiguity. See Tr. at 20:13-21 (Aragon).

> The ambiguity goes to, if you look at the listing of forms, endorsements, and
> schedule numbers, it specifically under the umbrella excess [policy] indicates UM
> 03450200 auto liability . . . . [T]he exclusion specifically states
> underinsured/uninsured is excluded, but yet it mentions auto liability in other
> provisions and documents, forms, listings and endorsements that were included in
> the copy that my client received . . . .

Tr. at 20:13-21 (Aragon)(alterations added).

The Court then asked for Travelers Indemnity's response. <u>See</u> Tr. at 21:1 (Court). Travelers Indemnity replied to the Anczarskis' assertion of ambiguity regarding coverage. <u>See</u> Tr. at 21:2-22:16 (Eaton).

> I guess now we're talking about the umbrella policy. Under the umbrella policy, Judge, that's a liability policy. It applies if there is coverage under the underlying CGL policy. So first there has to be coverage under the CGL policy for the umbrella [to apply]. It's a liability policy . . . [I]t protects the insured if they get sued for injuring somebody. It's not an uninsured motorist policy. And in fact it specifically includes an exclusion for uninsured motorist claims.

Tr. at 21:2-12 (Eaton)(alterations added). Travelers Indemnity further argued that both the Pennsylvania and the New Mexico "mandatory financial responsibility statutes that talk about the requirement of providing UM or UIM coverage specifically by case law do not apply to excess policies." Tr. at 21:22-22:1 (Eaton). Travelers Indemnity then again emphasized that the commercial general liability policy does not apply. <u>See</u> Tr. at 22:6 (Eaton). Travelers Indemnity again asserted, "I just, I don't know what the ambiguity is and I don't know where the coverage is. It's not in these policies." Tr. at 22:14-16 (Eaton). The Court then invited the Anczarskis to argue in opposition to Travelers Indemnity's Motion. <u>See</u> Tr. at 23:2-5 (Court).

Referring to various certificates of liability, the Anczarskis argued:

> According to the certificate of liability insurance and the insurance documents . . . it specifically states in the endorsement lists of forms, endorsements, and schedule numbers, auto liability following . . . umbrella excess coverage in regards to that. . . . If you look at the certificate of liability insurance that was issued since 2004, 2005, it checks under A, general liability, it says general commercial liability and it says policy occur check. Then there is another section called automobile liability policy and on there is hired [auto], nonowned [auto], and then on the bottom is excess liability occurrence retention. In comparison to the current certificate of liability, insurance the general liability component, which was initially checked on the first one commercial general liability the automobile hired auto nonowned auto was added to that. The automobile liability portion is not checked in the 2009, 2010 certificate of liability insurance. And also checked under excess liability, excess umbrella policy there

> is nothing indicating underinsured, nothing indicating [auto]. The mere indication
> that there is reference to use of an automobile, there is reference to use of an
> automobile, nonuse of an automobile does create confusion as to what is covered
> under . . . an automobile policy, an underinsured policy, an uninsured motorist
> automobile policy, or the general liability, commercial liability policy.

Tr. at 23:7-24:21 (Aragon). The Anczarskis also adverted to the excess liability policy, stating

that it "[s]pecifically identifies under section 2 who is the insured." Tr. at 26:20-21 (Aragon).

The Anczarskis referenced sections 2A1 and 2A2 of the excess liability policy. See Tr. at 26:23-

24 (Aragon). The Anczarskis further stated that, under those policy provisions, "an

insured defendant is anyone using an auto you own, hire, or borrow." Tr. at 27:5-6 (Aragon).

The Anczarskis then argued:

> Based on this we believe there is a genuine issue of material fact. The policy is
> ambiguous . . . [and therefore] goes in favor of the insured, and the law does
> provide as we stated in our response ambiguities arise when separate sections of
> the policy appear to be in conflict with one another. When the language of the
> provision is susceptible to more than one meaning, when the structure of the
> contract is illogical or when a particular matter of coverage is not explicitly
> addressed by the policy. . . . In this case it's clear that the policy does conflict in
> regards to the sections stated. And pursuant to the law as cited coverage applies
> equally to the victims of accidents whether or not they are family members . . . .

Tr. at 27:6-24 (Aragon)(alterations added). The Anczarskis additionally argued that, under

Gov't Emps. Ins. Co. v. Welch, 2004-NMSC-014, 90 P.3d 471, the Court should conclude that,

"[i]f an insurance company offers insurance in excess of limits required by law, and it contains

vehicle coverage, then it applies equally to victims of such accidents whether they're family

members or not." Tr. at 29:14-18 (Mendoza). The Anczarskis concluded "that there is . . . a

genuine issue of material fact . . . ." Tr. at 31:6-7 (Aragon)(alterations added). The Anczarskis

also offered John J. Anczarski's testimony, as he was present for the hearing. See Tr. at 31:8

(Aragon). The Court then invited Travelers Indemnity's response and specifically solicited

Travelers Indemnity's thoughts on the introduction of John J. Anczarski's testimony at a hearing

on a summary judgment motion.  See Tr. at 31:10-15.

> Travelers Indemnity replied:
>
> [T]he policies were not disputed, and they're before the Court. . . . [T]his is purely a question of the Court looking at the policies and then determining whether either policy provides applicable coverage.  So . . . for them to have Mr. Anczarski testify now and who knows what he might say, but it's really not relevant to the legal issue before the Court, and the interpretation of these contracts.  Even if Mr. Anczarski were to testify [-- "]I thought I was getting uninsured motorist coverage.  I wanted uninsured motorist coverage[" --] that goes to the reasonable expectations theory that only potentially could come into play, if there is ambiguities in these policies, which there is not.  So I don't think it's appropriate or reasonable or fair to have  witness testify here at the summary judgment hearing on this motion that's been before the Court . . . several weeks.

Tr. at 31:19-32:11 (Eaton).  Travelers Indemnity then concluded:

> I want to make sure it's really clear that Travelers issued two policies.  And in the plaintiff's exhibit which is at docket 35-2, is an email from somebody called Karen Crow at Marsh [Commercial Business Center[3]], and/or Karen Crow writes to Mr. Anczarski [-- "]good afternoon John, per our conversation I have confirmed that both of your policies referenced above are in effect at this time[" --] and the policies referenced above are the business owner's policy and the umbrella policy.  No auto policy because -- and this is document 31-3 in the Court docket, the Anczarskis obtained auto coverage from Erie Insurance Group.  So they had automobile coverage.  It just wasn't through Travelers.

Tr. at 32:17-33:7 (Eaton).

The Court refused to allow Mr. Anczarski's viva voce testimony, but suggested to the

Anczarskis that they could file an opposed or unopposed motion to supplement the record, first

asking for Travelers Indemnity's position on adding the proffered documents to the record.  See

Tr. at 33:10-25 (Court).  See also Tr. at 35:17-21 (Court)("But once you print and run it past Mr.

Eaton and Mr. Eaton may think it's irrelevant and not have any opposition to it coming in.  On

---

[3]Marsh is a wholly owned subsidiary of Marsh & McLennan Companies and conducts business in insurance broking and risk management.  See Marsh "Who We Are," https://www.marsh.com/us/about-marsh/aboutus.html (last visited, July 11, 2017).

the other hand if he opposes it, you can file a motion on that score to get it in."). The Court then stated that it was "just not seeing coverage . . . that is going to cause Travelers to be liable." Tr. at 34:1-2 (Court)(alteration added). The Court thanked the parties for their presentations. See Tr. at 37:3-4 (Court).

    **5.**    <u>**The Anczarskis' Motion to Supplement Record.**</u>

On June 28, 2017, the Anczarskis filed their Motion to Supplement Record. The Anczarskis note that, at the hearing, they informed the Court "that they inadvertently uploaded the wrong Certificate of Liability Insurance . . . issued by Travelers Indemnity Company as reference in Plaintiffs' Response to Defendant's Motion for Summary Judgment." Motion to Supplement Record at 1. The Anczarskis submit "the correct Certificate of Liability Insurance issued by Travelers Indemnity Company with the policy effective date of 12/25/2009 and policy expiration date of 12/25/2010." Motion to Supplement Record at 1. The Anczarskis state that they provide this document to Travelers Indemnity on January 3, 2017, and, consequently, that "Defendant would not be prejudiced by this information." Motion to Supplement Record at 2. See 2010 Certificate of Liability Insurance. Additionally, the Anczarskis submit the Amended Verification that corresponds to John J. Anczarski's Supplemental Answers. The Anczarskis also attach the Affidavit of John J. Anczarski Supplementing the Record (sworn June 23, 2017), filed June 28, 2017 (Doc. 46-3)("Anczarski's Supplemental Affidavit"), in conjunction with the supplemental exhibits, because "his testimony was not allowed at the motion hearing." Motion to Supplement Record at 2. John J. Anczarski states that he received the 2010 Certificate of Liability Insurance "from Traveler's [sic] Indemnity Company" and that the certificate "has not been changed or altered." Anczarski's Supplemental Affidavit ¶¶ 2-4, at 1.

6.      **Travelers' Response to the Anczarskis' Motion to Supplement Record.**

On July 3, 2017, Travelers Indemnity filed The Travelers Indemnity Company's Response to Plaintiffs' Motion to Supplement the Record, filed July 3, 2017 (Doc. 47)("Response to Motion to Supplement").  Travelers Indemnity argues that the Court should deny the Motion to Supplement Record as untimely.  See Response to Motion to Supplement at 1.  Travelers Indemnity further contends that the Anczarskis' "proposed 'correct exhibits' do not raise any new facts or create any disputed issues of material fact."  Response to Motion to Supplement at 1.  "Even if the 'corrected exhibits' are considered," Travelers Indemnity maintains, "they do not change the basic fact that Plaintiffs have not and cannot point to any provision in either Travelers liability policy that would provide uninsured/underinsured ('UN/UIM') motorist coverage."  Response to Motion to Supplement at 1.  Travelers Indemnity reemphasizes that the Anczarskis "cannot dispute that liability coverage does not apply because no cause of action has ever been brought against Travelers' insured, Mark's Supply."  Response to Motion to Supplement at 1.  Moreover, Travelers Indemnity presses that "[a]ny claim by the Estate of John R. Anczarski against his parents or their company in the future would be frivolous as barred by the applicable statute of limitations."  Response to Motion to Supplement at 1 (alteration added).

Travelers Indemnity next turns to the 2010 Certificate of Liability Insurance.  See Response to Motion to Supplement at 2.  Travelers Indemnity states that "[t]his certificate shows there was no automobile insurance policy issued to the insured, Mark's Supply."  Response to Motion to Supplement at 2.  Moreover, Travelers Indemnity argues that the 2010 Certificate of Liability Insurance is not admissible into evidence, because there "is also no evidence as to who prepared the certificate, thus leaving it without any foundation whatsoever." Response to Motion

to Supplement at 2.  "[E]ven if it is considered," Travelers Indemnity insists, the 2010 Certificate

of Liability Insurance "does not add any new facts or change any facts already before the Court."

Response to Motion to Supplement at 2.  Travelers Indemnity then addresses the Amended

Verification, arguing that, even when verified, "Mr. Anczarski's interrogatory answers before the

Court do not change the clear language of the insurance policies or create any ambiguities in the

policies' language."  Response to Motion to Supplement at 2.  Travelers Indemnity concludes:

> These proposed exhibits add nothing to the issue of whether the two Travelers
> policies provided UM/UIM coverage or any other applicable coverage.
> Moreover, they do not change the fact that Plaintiffs did not and still do not
> dispute any of Travelers' enumerated material facts, nor do they change the fact
> that Plaintiffs failed to submit any enumerated facts of their own.

Response to Motion to Supplement at 1-2.

Travelers Indemnity then states that summary judgment is appropriate with or without

these exhibits.  See Response to Motion to Supplement at 3.  Travelers Indemnity asserts that, at

the most, the Anczarskis have argued "that there is some unspecified ambiguity because the

excess liability policy mentions excess auto liability coverage if an underlying policy provides

auto liability coverage, but excludes UM/UIM claims."  Response to Motion to Supplement at 3.

Nevertheless, Travelers Indemnity maintains that summary judgment is warranted.  See

Response to Motion to Supplement at 3.  Travelers Indemnity states that its "policies are

absolutely clear that they do not provide UM/UIM coverage."  Response to Motion to

Supplement at 3.  Travelers Indemnity concludes:

> The facts are absolutely clear that Plaintiffs have never brought a claim or cause
> of action against themselves in which they allege that they are responsible for
> their son's death.  The Plaintiffs and their business have never been named as
> defendants in a wrongful death lawsuit.  The law is absolutely clear that any such
> action now would be barred by the statutes of limitations in both Pennsylvania
> (where the policies were issued) and New Mexico (where the vehicle-bicycle
> accident occurred).  In short, there is not coverage under either policy for the

death of John R. Anczarski. . . .  This case presents a classic situation under which summary judgment is appropriate.

Response to Motion to Supplement at 3.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[4]  Once the movant meets this

---

[4]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex, this sentence is widely understood to be an

burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

---

accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)("Schuylkill"); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States of America concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.  550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The United States Court of Appeals for the Tenth Circuit applied this doctrine in

Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[5]] explained that the

---

[5]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483

blatant contradictions of the record must be supported by more than other witnesses'
testimony[.]"    Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.
2010)(Browning, J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

Rule 56(c) of the Federal Rules of Civil Procedure also provides guidance regarding how
to support an assertion that a fact is, or cannot be, genuinely disputed.  See Fed. R. Civ. P. 56(c).
That subsection provides:

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is
genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including
depositions, documents, electronically stored information, affidavits or
declarations, stipulations (including those made for purposes of the motion
only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or
presence of a genuine dispute, or that an adverse party cannot produce
admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may
object that the material cited to support or dispute a fact cannot be presented in a
form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it
may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or
oppose a motion must be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant or declarant is competent to
testify on the matters stated.

Fed. R. Civ. P. 56(c).

_____

F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will
assist the Court in its preparation of this Memorandum Opinion and Order.

**LAW REGARDING NEW MEXICO CHOICE-OF-LAW RULES**

Where a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).  The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue."  Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d 374, 377.  There are only a few categories within which claims might fall -- "[t]ort cases, i.e., all 'civil wrongs,' are one class; contracts, i.e., every kind of enforceable promise, is another single class."  J. McLaughlin, Conflict of Laws: the Choice of Law Lex Loci Doctrine, the Beguiling Appeal of a Dead Tradition, Part One, 93 W. Va. L. Rev. 957, 989 (1991)(describing the categories as "tort, contract, or some other").  The court is then to apply the New Mexico choice-of-law rule applicable to that category of claim to determine what state's substantive law to apply.  See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 749 F. Supp. 2d 1235, 1257 (D.N.M. 2010)(Browning, J.).

When a claim sounds in contract, New Mexico will generally apply the choice-of-law rule of lex loci contractus -- the law of the place of contracting.  See Ferrell v. Allstate Ins. Co., 2008-NMSC-042, ¶ 51, 188 P.3d 1156, 1172 (2008).  Like most states, however, "New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215, 1218 (2008)(citing N.M. Stat. § 55-1-301(A)).  See United Wholesale Liquor Co. v. Brown-Forman Distillers Corp., 1989-NMSC-030, ¶¶ 12-14,  775 P.2d

233, 236.  "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218.  "New Mexico courts will not give effect to another state's laws where those laws would violate some fundamental principle of justice."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218 (internal quotations omitted).  Where the plaintiff has invoked the federal district court's diversity jurisdiction, the court will accept New Mexico's law regarding whether to honor a contractual choice-of-law provision.  See MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc., 436 F.3d 1257, 1260 (10th Cir. 2006)("In cases like this one, where subject matter jurisdiction is based on diversity of citizenship, federal courts must look to the forum state's choice-of-law rules to determine the effect of a contractual choice-of-law clause.").  See also Estate of Anderson v. Denny's Inc., 987 F. Supp. 2d 1113, 1139-40 (D.N.M. 2013)(Browning, J.).

The Supreme Court of New Mexico has recognized one exception to the lex loci contractus rule.  See State Farm Mut. Auto. Ins. Co. v. Ballard, 2002-NMSC-030, 54 P.3d 537, 539.  "To overcome the rule favoring the place where a contract is executed, there must be a countervailing interest that is fundamental and separate from general policies of contract interpretation."  Shope v. State Farm Ins. Co., 1996-NMSC-052, ¶ 9, 925 P.2d 515, 517.  Application of the rule must result in a violation of "fundamental principles of justice" before applying New Mexico law rather than the law of the jurisdiction where the contract was signed.  Shope v. State Farm Ins. Co., 1996-NMSC-052, ¶ 7, 925 P.2d at 517.  See Reagan v. McGee Drilling Corp., 1997-NMCA-014, ¶ 9, 933 P.2d 867, 869 ("The threshold . . . is whether giving effect to another state's policies would 'violate some fundamental principle of justice, some

prevalent conception of good morals, some deep-rooted tradition of the common weal' of the forum state.")(alteration added)(citation omitted).  "This exception applies only in 'extremely limited' circumstances."  Reagan v. McGee Drilling Corp., 1997-NMCA-014, ¶ 9, 933 P.2d at 869 (citation omitted).

If the underlying claim is categorized as a tort, "New Mexico courts follow the doctrine of *lex loci delicti commissi* -- that is, the substantive rights of the parties are governed by the law of the place where the wrong occurred."  Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 12, 142 P.3d at 377.  The *lex loci delicti* rule defines the state where the wrong occurred as "the state where the last event necessary to make an actor liable for an alleged tort takes place."  Restatement (First) Conflicts of Law § 377 & cmt. a (1934).  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 1976-NMCA-072, ¶ 9, 553 P.2d 1288, 1289 (referring to the rule as requiring application of "the law of the State of injury"); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 663 F. Supp. 2d 1138, 1150-51 (D.N.M. 2009)(Browning, J.).

**LAW REGARDING THE INTERPRETATION OF INSURANCE CONTRACTS UNDER PENNSYLVANIA LAW**

Under Pennsylvania law, it is the Court's province to interpret insurance contracts.  See Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir.1997)(citing Standard Venetian Blind Co. v. American Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983)).  The inquiry's focus is the insured's reasonable expectation, and the Court must examine the totality of the insurance transaction.  See Bubis v. Prudential Property & Cas. Ins. Co., 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998)(citing Dibble v. Security of America Life Ins. Co., 590 A.2d 352, 354 (Pa. Super. Ct. 1991)).  "While reasonable expectations of the insured are the focal points in

interpreting the contract language of insurance policies, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous." Bubis v. Prudential Property & Cas. Ins. Co., 718 A.2d at 1272 (internal citations omitted). Consequently, if "the language of the contract is clear and unambiguous, a court is required to give effect to that language.'" Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994)(quoting Standard Venetian Blind, 469 A.2d at 566 (1983)). Determining whether a policy is ambiguous is a question of law. See Pacific Indem. Co. v. Linn, 766 F.2d 754, 760 (3d Cir. 1985)). "A provision is ambiguous only if reasonably intelligent persons, considering it in the light of the entire policy, can honestly differ as to its meaning." Curbee, Ltd. v. Rhubart, 594 A.2d 733, 735 (Pa. Super. Ct. 1991). See also N. Ins. Co. of N.Y. v. Dottery, 43 F. Supp. 2d 509, 512 (E.D. Pa. 1998)(Wieand, J.).

## LAW REGARDING CONTRACT AMBIGUITY UNDER PENNSYLVANIA CONTRACT LAW

> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. Pines Plaza Bowling, Inc. v. Rossview, Inc., 145 A.2d 672 (Pa. 1958). When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986). When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. Steuart v. McChesney, 444 A.2d 659, 663 (Pa. 1982); Herr's Estate, 161 A.2d 32, 34 (Pa. 1960). A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Hutchison, 519 A.2d at 390. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact. Community College v. Society of the Faculty, 375 A.2d 1267, 1275 (Pa. 1977).

Kripp v. Kripp, 849 A.2d 1159, 1163 (Pa. 2004). See Metzger v. Clifford Realty Corp., 476 A.2d 1, 5 (Pa. Super. Ct. 1984). Under Pennsylvania law, a contract will be found to be ambiguous:

"[I]f, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.  A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction."

Metzger v. Clifford Realty Corp., 476 A.2d 1, 5 (Pa. Super. Ct. 1984)(quoting Commonwealth

State Highway and Bridge Authority v. E.J. Albrecht Co., 430 A.2d 328, 330 (Pa. Commw. Ct.

1981)).

## LAW REGARDING RELIANCE ON THE SUPERIOR COURT OF PENNSYLVANIA'S CASE LAW

The Court considers Superior Court of Pennsylvania opinions with the understanding

that, while the Court certainly may and will consider such opinions in making its determination,

the Court is not bound by a Superior Court of Pennsylvania decision in the same way that it

would be bound by a Supreme Court of Pennsylvania decision.  See Mosley v. Titus, 762 F.

Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(alterations added)(noting that, where the only

opinion on point is "from the Court of Appeals [of as state], . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court [of a state] would do if

the case were presented to it")(alterations added)(citing Wade v. EMCASCO Ins. Co., 483 F.3d

657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the

federal court must attempt to predict what the state's highest court would do," and that, "[i]n

doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")).

The Supreme Court has addressed what the federal courts may use when there is not a

decision on point from the state's highest court.  See Comm'r v. Estate of Bosch, 387 U.S. 456,

465 (1967). In the past, the Supreme Court directed federal courts, in the absence of controlling

authority from the highest state court, to follow intermediate state court decisions:

> The highest state court is the final authority on state law, but it is still the duty of
> the federal courts, where the state law supplies the rule of decision, to ascertain
> and apply that law even though it has not been expounded by the highest court of
> the State. An intermediate state court in declaring and applying the state law is
> acting as an organ of the State and its determination, in the absence of more
> convincing evidence of what the state law is, should be followed by a federal
> court in deciding a state question. We have declared that principle in West v.
> American Telephone and Telegraph Co., 311 U.S. 223 (1940), decided this day.
> It is true that in that case an intermediate appellate court of the State had
> determined the immediate question as between the same parties in a prior suit, and
> the highest state court had refused to review the lower court's decision, but we set
> forth the broader principle as applicable to the decision of an intermediate court,
> in the absence of a decision by the highest court, whether the question is one of
> statute or common law. . . . The question has practical aspects of great importance
> in the proper administration of justice in the federal courts. It is inadmissible that
> there should be one rule of state law for litigants in the state courts and another
> rule for litigants who bring the same question before the federal courts owing to
> the circumstance of diversity of citizenship. In the absence of any contrary
> showing, the rule [set forth by two New Jersey trial courts, but no appellate
> courts] appears to be the one which would be applied in litigation in the state
> court, and whether believed to be sound or unsound, it should have been followed
> by the Circuit Court of Appeals.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).

"The Supreme Court has softened this position over the years." Anderson Living Trust v.

WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 (D.N.M. 2014)(Browning, J.). Federal

courts are no longer bound by state trial or intermediate court opinions, but "should attribute

[them] some weight . . . where the highest court of the State has not spoken on the point."

Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial

Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal

Practice § 124.20[2], at 124-75 (3d ed. 1999)("Decisions of intermediate state appellate courts

usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted).  See also Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243.

## NEW MEXICO LAW REGARDING UNINSURED MOTORIST COVERAGE

N.M.S.A. 1978, § 66-5-301(A) and (C), in relevant part, state:

A.    No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death and for injury to or destruction of property as set forth in Section 66-5-215 NMSA 1978 and such higher limits as may be desired by the insured, but up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

. . . .

C.    . . . .  [T]he named insured shall have the right to reject uninsured motorist coverage as described in Subsections A and B of this section; provided that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him by the same insurer.

N.M. Stat. Ann. § 66-5-301(A) & (C).  Regulation 13.12.3.9, which elaborates § 66-5-301, provides: "The rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be

endorsed, attached, stamped, or otherwise made a part of the policy of bodily injury and property damage insurance."  N.M. Admin. Code § 13.12.3.9.

The Supreme Court of New Mexico has recognized that § 66-5-301 "embodies a public policy of New Mexico to make uninsured motorist coverage a part of every automobile liability insurance policy issued in this state, with certain limited exceptions," and that the statute is "intended to expand  insurance coverage and to protect individual members of the public against the hazard of culpable uninsured motorists."  Romero v. Dairyland Ins. Co., 1990-NMSC-111, 803 P.2d 243, 245.    Based upon those observations, the Supreme Court of New Mexico considers § 66-5-301 a remedial statute and, thus, maintains that it be liberally interpreted to further its purpose, construing exceptions to uninsured motorist coverage strictly to protect the insured.  See Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 6.  The Supreme Court of New Mexico has noted that an insured may reject uninsured motorist coverage, but that such rejection must satisfy the applicable regulations.  See Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 8.  To be valid, a rejection of uninsured motorist coverage must be made a part of the policy by endorsement on the declarations sheet, by attachment of the written rejection to the policy, or by some other means that makes the rejection a part of the policy so as to clearly and unambiguously call to the insured's attention that uninsured motorist coverage has been waived.  See Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 8.  With respect to the regulation requiring that the rejection be made a part of the policy delivered to the insured, the Supreme Court of New Mexico has stated:

> [Regulation 13.12.3.9] ensure[s] that the insured has affirmative evidence of the extent of coverage.  Upon further reflection, consultation with other individuals, or after merely having an opportunity to review one's policy at home, an individual may well reconsider his or her rejection of uninsured motorist coverage.   Providing affirmative evidence of the rejection of the coverage

> comports with a policy that any rejection of the coverage be knowingly and intelligently made. Any individual rejecting such coverage should remain well informed as to that decision. We find that the regulation of the superintendent of insurance furthers a legislative purpose to provide for the inclusion of uninsured motorist coverage in every automobile liability policy unless the insured has knowingly and intelligently waived such coverage.

Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 9. Based upon that assessment of § 66-5-301 and N.M. Admin. Code § 13.12.3.9, the Supreme Court of New Mexico has held that, unless the named insured rejects uninsured motorist coverage in a manner consistent with statutory and administrative requirements, uninsured motorist coverage shall be read into an insured's policy regardless of the parties' intent or the fact that the insured has not paid a premium. See Kaiser v. DeCarrera, 1996-NMSC-050, 923 P.2d 588, 590 (quoting Romero v. Dairyland Ins. Co., 1990-NMSC-111, ¶ 1). In Kaiser v. DeCarrera, the Supreme Court of New Mexico ruled that a valid rejection of uninsured motorist coverage did not take place and, therefore, read uninsured motorist coverage into the policy. See 1996-NMSC-050, ¶ 17. The plaintiff had signed a rejection as part of the application for insurance, and the insurance company sent an amended policy reflecting the rejection to the address on the application that was returned to sender. See 1996-NMSC-050, ¶ 10. The Supreme Court of New Mexico found that the plaintiff was never provided a policy with the rejection included and that, as a result, uninsured motorist coverage should be read into the policy. See 1996-NMSC-050, ¶ 10.

In Montano v. Allstate Indemnity Co., 2004-NMSC-020, 92 P.3d 1255, the Supreme Court of New Mexico addressed the stacking of insurance coverage, noting that its cases had "expressed a public policy in favor of stacking," and that "it is unfair not to allow stacking when multiple premiums are paid or when the policy is otherwise ambiguous." 135 N.M. at 685, 92 P.3d at 1259 (emphasis original). The Supreme Court of New Mexico indicated that it would

take the opportunity to "chart a new course." Montano v. Allstate Indem. Co., 135 N.M. at 686, 92 P.3d at 1260. Interpreting § 66-5-301(A) and (C), the Supreme Court of New Mexico held that "an insurance company should obtain written rejections of stacking in order to limit its liability based on an anti-stacking provision," and that, with "written waivers, insureds will know exactly what coverage they are receiving and for what cost." Montano v. Allstate Indem. Co., 135 N.M. at 686-87, 92 P.3d at 1260-61. The Supreme Court of New Mexico also illustrated its holding:

> [I]n a multiple-vehicle policy insuring three cars, the insurer shall declare the premium charge for each of the three [uninsured or underinsured motorist] coverages and allow the insured to reject, in writing, all or some of the offered coverages. Thus, hypothetically, in the case of a $25,000 policy, if the premium for one [uninsured or underinsured motorist] coverage is $65, two coverages is an additional $60, and three coverages $57, the insured who paid all three (for a total premium of $182) would be covered up to $75,000 in [uninsured or underinsured motorist] bodily injury coverage. However, the insured may reject, in writing, the third available coverage and pay $125 for $50,000 of uninsured motorist coverage; or the insured may reject, in writing, the third available coverage and pay $65 for $25,000 of [uninsured or underinsured motorist] coverage; or the insured may reject all three [uninsured or underinsured motorist] coverages. In any event, the coverage would not depend on which vehicle, if any, was occupied at the time of the injury. Thus, the insured's expectations will be clear, and an insured will only receive what he or she paid for.

Montano v. Allstate Indem. Co., 135 N.M. at 687, 92 P.3d at 1261.

In Marckstadt v. Lockheed Martin Corp., 2010-NMSC-001, 147 N.M. 678, 229 P.3d 462, the Supreme Court of New Mexico consolidated cases before it, including a case that the Tenth Circuit certified to it, to answer the question what is required under § 66-5-301 and N.M.A.C. § 13.12.3.9 to effectively reject uninsured motorist coverage. See 2010-NMSC-001, ¶ 13.[6] The

---

[6]The Tenth Circuit certified Federated Serv. Inc. Co. v. Martinez, 300 F. App'x 618 (10th Cir. 2008)(unpublished), and the question: "For a valid rejection of [uninsured or underinsured motorist] coverage under New Mexico law, must that rejection be written, signed by the insured,

Supreme Court of New Mexico held that, "in order for the offer and rejection requirements of Section 66-5-301 to effectuate the policy of expanding [uninsured or underinsured motorist] coverage, the insurer is required to <u>meaningfully offer</u> such coverage and the insured must <u>knowingly and intelligently act</u> to reject it before it can be excluded from a policy." <u>Marckstadt v. Lockheed Martin Corp.</u>, 2010-NMSC-001, ¶ 16 (emphasis in original). It found that "the rejection which the regulation requires to be in writing must be the <u>act</u> of rejection described in the statute" and held that an insured must reject uninsured motorist coverage in writing. <u>Marckstadt v. Lockheed Martin Corp.</u>, 2010-NMSC-001, ¶ 22 (emphasis in original). In <u>Progressive Northwestern Insurance Co. v. Weed Warrior Services</u>, 2010-NMSC-050, 245 P.3d 1209, the Supreme Court of New Mexico answered

> in the affirmative the question, certified to us by the United States Court of Appeals for the Tenth Circuit, of whether election by an insured to purchase [uninsured or underinsured motorist] coverage in an amount less than the policy limits constitutes a rejection of the maximum amount of [uninsured or underinsured motorist] coverage permitted under Section 66-5-301.

2010-NMSC-050, ¶ 1.[7]  It found that § 66-5-301 provides that insurers must offer uninsured motorist coverage, or underinsured motorist coverage, in an amount greater than the minimums

---

and attached to the policy."  300 F. App'x at 619.  In the district court, the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, granted the plaintiffs' motion for summary judgment and found that the defendant's employer had validly rejected uninsured motorist coverage for its employees.  <u>See</u> <u>Federated Serv. Inc. Co. v. Martinez</u>, No. 06-638, 2007 WL 8045157, at *4 (D.N.M. July 14, 2006)(Parker, J.), <u>rev.</u>, 385 F. App'x 845. After the Supreme Court of New Mexico decided <u>Marckstadt v. Lockheed Martin Corp.</u>, the Tenth Circuit reversed Senior Judge Parker's judgment.  <u>See</u> <u>Federated Serv. Ins. Co. v. Martinez</u>, 385 F. App'x 845, 849-50 (10th Cir. 2010).

[7]Citing the split among the district judges in the United States District Court for the District of New Mexico, the Tenth Circuit certified, in <u>Progressive Northwestern Ins. Co. v. Weed Warrior Services</u>, 368 F. App'x 853 (10th Cir. 2010)(unpublished), the question: "Does the election to take [uninsured or uninsured motorist] coverage for less than the general policy liability limits constitute a rejection under the New Mexico uninsured motorist statute, N.M. Stat.

required.  See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 10.  The Supreme Court of New Mexico held that the "Legislature intended for drivers to have the option of carrying UM/UIM coverage equal to their policy limits," and rejected "any suggestion that Section 66-5-301 places a burden on the insured to request UM/UIM coverage."  Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶¶ 12-13.  It noted that the right to reject coverage cannot be meaningfully exercised without an offer of coverage equal to policy limits, and that it would not "impose on the consumer an expectation that she or he will be able to make an informed decision as to the amount of UM/UIM coverage desired or required without first receiving information from the insurance company."  Progressive N.W. Ins. Co. v. Weed Warrior Servs., 2010-NMSC-050, ¶ 13.

In Jordan v. Allstate Ins. Co., 2010-NMSC-051, 254 P.3d 1214, the Supreme Court of New Mexico granted certiorari in three cases and consolidated them for review.  In all three cases, the insured was injured in an accident involving an uninsured motorist.  See Jordan v.

---

§ 66-5-301(A)."  368 F. App'x at 854.  In its certification order, the Tenth Circuit noted that the Court had held, in Farm Bureau Mutual Insurance Co. v. Jameson, 472 F. Supp. 2d 1272 (D.N.M. 2006)(Browning, J.), that election to take uninsured motorist coverage in an amount less than the general coverage constitutes a rejection under the New Mexico statute.  See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 368 F. App'x at 857 (citing Farm Bureau Ins. Co. v. Jameson, 472 F. Supp. 2d at 1280)(the Tenth Circuit incorrectly stated the Court's holding, stating that "election to take UM/UIM coverage in amount less than the general coverage constitutes a rejection under the New Mexico statute," when the Court held that such election does not constitute a rejection without a signed, written rejection).  In the district court, in Progressive N.W. Ins. Co. v. Weed Warrior Servs., the Honorable Judith C. Herrera, United States District Judge for the District of New Mexico, denied both the defendant's and the plaintiff's motions for summary judgment.  See 588 F. Supp. 2d 1281, 1282 (D.N.M. 2008)(Herrera, J.).  Judge Herrera found that the policy at issue "should be enforced as written, to provide $100,000 in [uninsured or underinsured motorist] coverage, which is offset by the $100,000 already received from the tortfeasor, rather than being reformed to provide $1 million in [uninsured or underinsured motorist] coverage."  Progressive N.W. Ins. Co. v. Weed Warrior Servs., 588 F. Supp. 2d at 1288.  After the Supreme Court of New Mexico reached its decision, the Tenth Circuit reversed Judge Herrera.  See Progressive N.W. Ins. Co. v. Weed Warrior Servs., 405 F. App'x 284, 288 (10th Cir. 2010)(unpublished).

<u>Allstate Ins. Co.</u>, 2010-NMSC-051, ¶¶ 5-1.  The Supreme Court of New Mexico held that "a rejection of UM/UIM coverage equal to the liability limits in an automobile insurance policy must be made in writing and must be made a part of the insurance policy delivered to the insured."  2010-NMSC-051, ¶ 2.  It then further found that:

> In order to honor these requirements effectively, insurers must provide the insured with the premium charges corresponding to each available option for UM/UIM so that the insured can make a knowing and intelligent decision to receive or reject the full amount of coverage to which the insured is statutorily entitled.  If an insurer fails to obtain a valid rejection, the policy will be reformed to providing UM/UIM coverage equal to the limits of liability.

2010-NMSC-051, ¶ 2.  It noted that "insurers continue to offer UM/UIM] coverage in ways that are not conducive to allowing the insured to make a realistically informed choice," and concluded it "necessary to prescribe workable requirements for a valid and meaningful rejection of UM/UIM coverage in amounts authorized by statute."  2010-NMSC-051, ¶ 20.  The Supreme Court of New Mexico then provided:

> When issuing an insurance policy, an insurer must inform the insured that he or she is entitled to purchase [uninsured or underinsured motorist] coverage in an amount equal to the policy's liability limits and must also provide the corresponding premium charge for that maximum amount of [uninsured or underinsured motorist] coverage.  The premium cost for the minimum amount of [uninsured or underinsured motorist] coverage allowed by Section 66-5-301(A) must also be provided, as well as the relative costs for any other levels of [uninsured or underinsured motorist] coverage offered to the insured.  The insured must be informed that he or she has a right to reject [uninsured or underinsured motorist] coverage altogether.  Providing the insured with a menu of coverage options and corresponding premium costs will enable the insured to make an informed decision . . . .

2010-NMSC-051, ¶ 21.  It held that, unless these requirements are met, the "policy will be reformed to provide UM/UIM coverage equal to the liability limits."  2010-NMSC-051, ¶ 22. The Supreme Court of New Mexico also found that the rules that it announced should be applied

retroactive, because, on balance, "we deem it more equitable to let the financial detriments be borne by insurers, who were in a better position to ensure meaningful compliance with the law" and because retroactive application "will ensure that all insureds will be treated equally." Jordan v. Allstate Ins. Co., 2010-NMSC-051, ¶ 29.

In State Farm Mutual Automobile Insurance Co. v. Safeco Insurance Co., 2013-NMSC-006, 298 P.3d 452, the Court of Appeals of New Mexico certified to the Supreme Court of New Mexico the question "whether the primary or the secondary underinsured motorist ('UIM') insurer, if either, should be given the statutory offset for the tortfeasor's liability coverage." 2013-NMSC-006, ¶ 1. The Supreme Court of New Mexico explained the problem through a hypothetical:

> A was a passenger in a vehicle driven by B, which was struck by a vehicle negligently driven by C. A sustains $500,000 in damages. C has liability coverage of $100,000. B has $100,000 in UIM coverage with XYZ Insurance Co. Because A was a passenger in the vehicle insured by XYZ, A is a Class II insured under the XYZ policy, and XYZ is the primary insurer because it insured the vehicle involved in the collision -- the car closest to the risk. A also has UIM coverage under three other policies, with policy limits of $100,000, $50,000, and $25,000, respectively. A is a Class I insured under the three policies because A is a named insured in each policy. Because these policies did not insure the vehicle involved in the collision, the insurers who issued the policies are considered to be secondary insurers. Therefore, A has $100,000 in primary UIM coverage, plus $175,000 in secondary UIM coverage, for a total of $275,000 in UIM coverage.

2013-NMSC-006, ¶ 2. In analyzing "whether XYZ Insurance Co. or the secondary insurers should receive an offset for the $100,000 of liability coverage available from C, the tortfeasor," the Supreme Court of New Mexico said "neither the primary nor the secondary insurers are directly awarded the offset because . . . the offset is applied before any UIM insurer is required to pay UIM benefits." 2013-NMSC-006, ¶¶ 3-4. The Supreme Court of New Mexico explained that, first, "one must determine both the tortfeasor's liability limits and the insured's total UIM

coverage, which may include multiple stacked policies." 2013-NMSC-006, ¶ 8. If the insured's damages exceed the tortfeasor's liability coverage, the insured may pursue a claim against the UIM insurers to recover the difference between his or her UIM coverage, and the tortfeasor's liability coverage, or the difference between his or her damages and the tortfeasor's liability coverage, whichever is less. See 2013-NMSC-006, ¶¶ 9, 15. The primary insurer must pay its policy limits before the secondary insurers pay in proportion to their respective policy limits. See 2013-NMSC-006, ¶¶ 4, 11. Under the hypothetical, the difference between A's UIM coverage and C's liability coverage -- $175,000.00 -- is less than the difference between A's damages and C's liability coverage -- $400,000.00 -- and, thus, A may pursue from the UIM insurers $175,000.00. See 2013-NMSC-006, ¶ 18.

> The primary UIM insurer pays its entire $100,000, leaving the secondary UIM insurers obligated to pay a prorated portion of $75,000. One secondary insurer pays $42,857.14, which is 4/7ths (100,000/175,000) of $75,000; one pays $21,428.57, which is 2/7ths (50,000/175,000) of $75,000; and the remaining secondary insurer pays $10,714.29, which is 1/7th (25,000/175,000) of $75,000. In no case will the insured receive more than the limits of the insured's UIM coverage minus the tortfeasor's liability payment or more than the insured's damages minus the tortfeasor's liability payment, whichever is less.

2013-NMSC-006, ¶ 19. Because the tortfeasor's liability limits are taken into consideration in what the UIM insurers must pay the injured insured, there is no "offset" to award: the injured insured will not receive more than he or she is permitted under the UIM statute. 2013-NMSC-006, ¶ 15. See Graham v. Troncoso, No. CIV 14-0745 JB/WPL, 2015 WL 1568433, at *17-22 (D.N.M. Mar. 30, 2015)(Browning, J.).

## ANALYSIS

The Court concludes the following: First, the Anczarskis may supplement the record to include the 2010 Certificate of Liability Insurance, and John J. Anczarski's Amended

Verification in support of his Supplemental Answers.  Second, under New Mexico's lex loci contractus choice-of-law rule, Pennsylvania contract law applies to the Anczarskis' breach-of-contract claim and uninsured or underinsured motorist claim, because the commercial general liability and excess liability policies at issue were executed in Pennsylvania.  Third, in light of the Travelers CGL Policy and the Travelers Excess Liability Policy at issue, there is no genuine issue of material fact whether Travelers Indemnity had an obligation to provide uninsured or underinsured motorist coverage to the Anczarskis or otherwise breached any contractual obligation owed to the Anczarskis under either insurance contract.

I.    **THE COURT GRANTS THE ANCZARSKIS' MOTION TO SUPPLEMENT THE RECORD UNDER ITS INHERENT POWER TO MANAGE ITS DOCKET.**

After the summary judgment motion hearing, the Anczarskis moved to supplement the record, submitting (i) "the correct Certificate of Liability Insurance issued by Travelers Indemnity Company with the policy effective date of 12/25/2009 and policy expiration date of 12/25/2010"; (ii) John J. Anczarski's Amended Verification corresponding to his Supplemental Answers; and (iii) John J. Anczarski's Supplemental Affidavit.  Motion to Supplement Record at 1.  See 2010 Certificate of Liability Insurance; Amended Verification; Anczarski's Supplemental Affidavit.  Travelers Indemnity opposes the Anczarskis' motion to supplement the record.  See Response to Motion to Supplement at 1-4.  The Anczarskis do not state the authority under which they file their motion to supplement the record.  See Motion to Supplement Record at 1.  Nor does Travelers Indemnity expressly advert to a rule of procedure that prohibits the admission the supplement exhibits.  See Response to Motion to Supplement at 1-4.  No party disputes, however, that the Court may allow the Anczarskis to supplement the record with correct exhibits.  See United States v. Schneider, 594 F.3d 1219, 1226 (10th Cir. 2010)("The power of district courts to manage their dockets is deeply ingrained in our jurisprudence."); United States v.

Nicholson, 983 F.2d 983, 988 (10th Cir. 1993)("District courts generally are afforded great discretion regarding trial procedure applications (including control of the docket and parties), and their decisions are reviewed only for abuse of discretion.").

The Anczarskis move to supplement the record, because "they inadvertently uploaded the wrong Certificate of Liability Insurance . . . issued by Travelers Indemnity Company as referenced in Plaintiffs' Response to Defendant's Motion for Summary Judgment . . . ." Motion to Supplement at 1. Indeed, the 2004 Certificate of Liability Insurance that the Anczarskis attached to their Response indicates December 25, 2004, as the "POLICY EFFECTIVE DATE" and December 25, 2005, as the "POLICY EXPIRATION DATE," which the Anczarskis stipulate is immaterial to this litigation. 2004 Certificate of Liability Insurance at 1. See Motion to Supplement at 1. Attached to their Motion to Supplement, the Anczarskis "submit the correct Certificate of Liability Insurance issued by Travelers Indemnity Company with the policy effective date of 12/25/2009 and policy expiration date of 12/25/2010." Motion to Supplement at 1 (citing 2010 Certificate of Liability Insurance). To support the authenticity of the 2010 Certificate of Liability Insurance, the Anczarskis also submit Anczarski's Supplemental Affidavit. See Anczarski's Supplemental Affidavit ¶¶ 1-5, at 1. Additionally, because the Anczarskis inadvertently failed to attach a verification to John J. Anczarski's Supplemental Answers, the Anczarskis move to supplement the record with the Amended Verification. See Motion to Supplement at 2 (citing Amended Verification).

The Court credits the Anczarskis' assertions that filling the 2004 Certificate of Liability and the omission of a verification were inadvertent. See Motion to Supplement Record at 1. Further, the Court cannot soundly conclude that admitting the 2010 Certificate of Liability Insurance -- which is at best cumulative of Travelers CGL Policy and Travelers Excess Liability

Policy -- would introduce new evidence. The Court is satisfied that the Anczarskis erroneously filed the 2004 Certificate of Liability Insurance and omitted to verify John J. Anczarski's Supplemental Answers, and the Court has the power to correct these misstatements and omissions in the record. Accordingly, the Court (i) grants the Motion to Supplement; (ii) admits 2010 Certificate of Liability Insurance, Amended Verification, and Anczarski's Supplemental Affidavit; and (iii) considers those record materials when adjudicating Travelers Indemnity's summary judgment motion.

## II.   PENNSYLVANIA LAW APPLIES TO THE ANCZARSKIS' CONTRACT AND UNINSURED MOTORIST CLAIMS.

Where a plaintiff invokes a federal district court's diversity jurisdiction, the district court looks to the forum state's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d at 1255. The first step in a New Mexico choice-of-law analysis is to characterize the claim by "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue." Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377. The Court then applies the New Mexico choice-of-law rule applicable to that category of claim to determine what state's substantive law to apply. See Guidance Endodontics, LLC v. Dentsply Intern., Inc., 749 F. Supp. 2d at 1257.

In this diversity action, the Anczarskis assert a breach-of-contract claim, and a claim for underinsured or insured motorist coverage, against Travelers Indemnity. See Amended Complaint ¶¶ 12, 25-26, at 3-4. The Court accordingly looks to New Mexico's choice-of-law rules to determine which state's substantive law to apply. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo, Inc., 431 F.3d at 1255. The Court applies the New Mexico choice-of-law rule for insurance contract claims, because the

Anczarskis assert two claims arising out of their insurance contracts with Travelers Indemnity. See Terrazas v. Garland & Loman, Inc., 2006-NMCA-111, ¶ 11, 142 P.3d at 377; Amended Complaint ¶¶ 12, 25-26, at 3-4. The Supreme Court of New Mexico has "stated that the policy of New Mexico is to interpret insurance contracts according to the law of the place where the contract was executed." Shope v. State Farm Ins. Co., 1996-NMSC-052, ¶ 9, 925 P.2d 515, 517. See Valencia v. Colo. Cas. Ins. Co., 560 F. Supp. 2d 1080, 1085 (D.N.M. 2007)(Browning, J.)(citing State Farm Mut. Auto. Ins. Co. v. Ballard, 2002-NMSC-030, ¶ 7, 54 P.3d 537, 539).

In New Mexico, an insurance contract is executed at the place to which the insurance policy is issued. See Wilkeson v. State Farm Mut. Auto. Ins. Co., 2014-NMCA-077, ¶¶ 2, 5, 329 P.3d 749, 750 (holding that "California law would govern as to issues pertaining to the insurance policies," because the "policies were issued to Plaintiff while she resided in California, and the policy covering the car in the accident, the only policy of record, lists her California address").[8] Cf. McGee v. Stonebridge Life Ins. Co., No. 05-4002-JAR, 2006 WL 2422399, at *5 (D. Kan. Aug. 14, 2006)(Robinson, J.)(concluding that the lex loci contractus rule "requires the court to interpret the contract according to the law of the state in which the parties performed the last act necessary to form the contract . . . [and] in the context of a group insurance policy, the last act is generally the delivery of the master insurance policy"). The two insurance contracts at issue in

---

[8]Wilkeson v. State Farm Mut. Auto. Ins. Co., 2014-NMCA-077, 329 P.3d 749, is a case decided by the Court of Appeals of New Mexico. Federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point." Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)(citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)). See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20[2], at 124-75 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions.")(emphasis and title case omitted). See also Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1243 (D.N.M. 2014)(Browning, J.).

this case -- the Travelers CGL Policy and the Travelers Excess Liability Policy -- were executed in Pennsylvania, because Travelers Indemnity issued both policy documents to Mark's Supply at its Frackville, Pennsylvania address.    See Travelers CGL Policy at 2 ("Frackville, PA"); Travelers Excess Liability Policy at 3 (same).    Accordingly, Pennsylvania substantive contract law applies to the Anczarskis' breach-of-contract, and underinsured or insured motorist coverage claims.

The Anczarskis do not argue that New Mexico law should apply because the lex loci contractus rule's application would contravene fundamental principles of justice and New Mexico public policy.    See Shope v. State Farm Ins. Co., 1996-NMSC-052, ¶ 7, 925 P.2d at 517 (explaining New Mexico's policy exception to the application of New Mexico's choice-of-law rules); Reagan v. McGee Drilling Corp., 1997-NMCA-014, ¶ 9, 933 P.2d 867, 869 (same). "[W]here counsel has failed to provide the Court with even the minimal factual and legal research necessary to the Court's analysis of the issues presented, the Court is under no obligation to, and will not, do counsel's work for them."    Abbasid, Inc. v. Los Alamos Nat. Bank, No. CV-09-00354 JP/LFG, 2010 WL 9485873, at *1 (D.N.M. July 23, 2010)(Parker, J.)(alteration added).    The Court notes that, despite omitting a choice-of-law argument, the Anczarskis nevertheless rely on New Mexico case law to support their opposition to Traveler's Motion -- principally Government Employees Insurance Co. v. Welch, 2004-NMSC-014, 90 P.3d 471, and Ponder v. State Farm Mutual Automobile Insurance Co., 2000-NMSC-033, 12 P.3d 960.    See Response at 4-7.    Accordingly, the Court pauses to clarify that New Mexico case law does not apply to direct the Court's interpretation of the Travelers CGL Policy and the Travelers Excess Liability Policy, because New Mexico's policy exception to its lex loci contractus choice-of-law rule does not apply.

Pennsylvania and New Mexico share concordant approaches to the inclusion of uninsured and underinsured motorist coverage in automobile insurance contracts. Compare 75 Pa. Cons. Stat. § 1731, with N.M. Stat. § 66-5-301(A)-(C). Each state requires that insurers offering motor vehicle liability insurance also offer uninsured motorist coverage, and each state allows an insured not to purchase uninsured motorist coverage when purchasing a primary automobile insurance policy. See N.M. Stat. § 66-5-301(A)-(C); 75 Pa. Cons. Stat. § 1731. Furthermore, both New Mexico and Pennsylvania case law hold, under the respective statutory provisions, that an insurer offering an excess liability policy[9] is not required to also offer uninsured motorist coverage. See Kromer v. Reliance Ins. Co., 677 A.2d 1224, 1230 (Pa. Super. Ct. 1996)(holding that excess umbrella and commercial excess liability insurance policies did not and were not required to provide uninsured motorist coverage), aff'd, 696 A.2d 152 (Pa. 1997); Archunde v. Int'l Surplus Lines Ins. Co., 1995-NMCA-110, ¶ 8, 905 P.2d 1128 (same). In light of the consistency between Pennsylvania's and New Mexico's approaches to uninsured or underinsured motorist coverage, the Court concludes that New Mexico's public policy exception to the application of its lex loci contractus choice-of-law rule does not apply. Consequently, Pennsylvania substantive contract law applies to the Anczarskis' breach of contract and underinsured or insured motorist coverage claims.

## III.    TRAVELERS INDEMNITY IS ENTITLED TO SUMMARY JUDGMENT ON THE ANCZARSKIS' INSURANCE CONTRACT CLAIMS.

The Supreme Court of Pennsylvania has stated that "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the

---

[9]"'An [excess liability or] 'umbrella' policy is a supplemental insurance policy which protects insureds against losses in excess of the amount covered by their other liability insurance policies and fills in gaps in coverage.'" Dottery, 43 F. Supp. 2d at 514 (quoting Fratus v. Republic Western Ins. Co., 147 F.3d 25, 27 n.1 (1st Cir. 1998)).

policy." Miller v. Boston Ins. Co., 218 A.2d 275, 277 (Pa. 1966). See McEwing v. Lititz Mut.

Ins. Co., 77 A.3d 639, 646 (Pa. Super. Ct. 2013)("In an action arising under an insurance policy,

our courts have established a general rule that it is a necessary prerequisite . . . for the insured to

show a claim within the coverage provided by the policy.")(alteration original)(internal quotation

marks and citation omitted). Two insurance policies that Travelers issued to Mark's Supply and

to John J. Anczarski and Joyce Anczarski,[10] were in effect when a vehicle that Waconda drove

fatally struck John R. Anczarski -- namely, the Travelers CGL Policy and the Travelers Excess

Liability Policy. See Travelers CGL Policy at 2; Travelers Excess Liability Policy at 2. The

record does not reflect a genuine issue of material fact whether either the Travelers CGL Policy

or the Travelers Excess Liability Policy provides Mark's Supply with uninsured or underinsured

motorist coverage -- or any other coverage -- for the losses related to the collision. In light of

Travelers CGL Policy and the Travelers Excess Liability Policy's unambiguous language,

Travelers did not insure Mark's Supply against losses arising from the collision. Accordingly,

Travelers is entitled to summary judgment on the Anczarskis' claims.

### A. THERE IS NO GENUINE ISSUE OF MATERIAL FACT REGARDING UNINSURED OR UNDERINSURED MOTORIST COVERAGE, AND TRAVELERS INDEMNITY IS ENTITLED TO JUDGMENT ON THE ANCZARSKIS' UNDERINSURED OR UNINSURED MOTORIST CLAIM UNDER PENNSYLVANIA LAW.

The Travelers CGL Policy does not refer to any coverage for a loss that an underinsured

or uninsured motorist causes. See Travelers CGL Policy at 1-145. The Travelers CGL Policy

provides coverage, however, for a defined and delimited category of automobile liability. See

Travelers CGL Policy at 21-22. Specifically, the policy includes an endorsement for "HIRED

---

[10]The Court observes that Travelers CGL Policy named both John J. Anczarski and Joyce
Anczarski as additional insureds under the "Commercial General Liability Coverage." See
Travelers CGL Policy at 19.

AUTO AND NONOWNED AUTO LIABILITY."  Travelers CGL Policy at 21.  The Anczarskis build their claims upon this provision, contending (i) that the Hired Auto and Nonowned Auto Liability endorsement creates an ambiguity regarding whether Travelers Indemnity provides them with uninsured or underinsured motorist coverage; and (ii) that this ambiguity, coupled with John J. Anczarskis' belief that the Travelers' policies provided uninsured or underinsured motorist coverage, creates a genuine issue of material fact precluding summary judgment in Travelers Indemnity's favor.  See Response at 5, 7 & 10.

The Hired Auto and Nonowned Auto Liability endorsement is unambiguous, however. See Travelers CGL Policy at 21-22.  "While reasonable expectations of the insured are the focal points in interpreting the contract language of insurance policies, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous."  Bubis v. Prudential Property & Cas. Ins. Co., 718 A.2d at 1272 (internal citations omitted).  "A provision is ambiguous only if reasonably intelligent persons, considering it in the light of the entire policy, can honestly differ as to its meaning."  Curbee, Ltd. v. Rhubart, 594 A.2d at 735.  In this case, the Hired Auto and Nonowned Auto Liability does not afford reasonable differences as to whether it provides uninsured or underinsured motorist coverage.  It plainly does not.  See Travelers CGL Policy at 21-22.

In light of its plain language, the Hired Auto and Nonowned Auto Liability endorsement insures Mark's Supply and the Anczarskis against (i) bodily injury that non-employees suffer; and (ii) damage to property not owned by Mark's Supply that arises from Mark's Supply's use of an automobile that Mark's Supply does not own.  See Travelers CGL Policy at 21-22.   Looking to the Hired Auto and Nonowned Auto Liability policy provision's terms, it provides coverage for "'bodily injury' and 'property damage' arising out of the maintenance or use of a 'hired auto'

or 'nonowned auto.'"  Travelers CGL Policy at 21.  The Hired Auto and Nonowned Auto

Liability policy provision excludes from coverage for bodily injury any bodily injury to Mark's

Supply's employees acting in the scope of Mark's Supply's business.  See Travelers CGL Policy

at 21 (excluding "[a]ny fellow 'employee' of the insured arising out of and in the course of: (a)

Employment by the insured").  The policy schedule also excludes from coverage damage to

property owned, transported by, rented or loaned to Mark's Supply, or within its care, custody, or

control.  See Travelers CGL Policy at 21.  Next, under the Hired Auto and Nonowned Auto

Liability policy schedule, a "hired auto" means any "auto" that the insured leases, hires, rents, or

borrows, excluding any auto hired, leased, or rented for a period of 180 days or more and any

auto hired, leased, or rented from an employee, partner, stockholder, or household member.

Travelers CGL Policy at 22.  A "nonowned auto," in turn, refers to any "autos" that the insured

does not own, lease, hire, rent or borrow that are being used in the course and scope of the

insured's business at the time of an occurrence that gives rise to liability, including autos owned

by employees, partners, or household members, but only while used in the course and scope at

the time of an occurrence giving rise to liability.  Travelers CGL Policy at 22.  This language

shows that the Hired Auto and Nonowned Auto Liability endorsement provides coverage for

third-party injuries arising out of Mark's Supply's use of nonowned vehicles, and not for an

insured's injuries arising out of any underinsured or uninsured motorist's use of any vehicle.  See

Travelers CGL Policy at 21.  Hence, the Hired Auto and Nonowned Auto Liability endorsement

does not provide the Anczarskis with uninsured or underinsured motorist coverage.

　　　　To be sure, Pennsylvania case law requires the Court to construe an insurance contract

against the writer.  See Miller v. Boston Ins. Co., 420 Pa. at 570.  Yet, the application of that

hornbook canon of contract interpretation to the Travelers CGL Policy is unavailing for the

Anczarskis.  If "the language of the contract is clear and unambiguous, a court is required to give effect to that language.'"  Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d at 1309 (quoting Standard Venetian Blind, 469 A.2d at 566).  The terms of the Hired Auto and Nonowned Auto Liability endorsement do not mention underinsured or uninsured motorist claims.  See Travelers CGL Policy at 21-22.  Rather, by its plain language, the Hired Auto and Nonowned Auto Liability endorsement covers third-party injuries arising out of Mark's Supply's use of nonowned vehicles, and not an insured's injuries arising out of any underinsured or uninsured motorist's use of any vehicle.  See Travelers CGL Policy at 21.

In reaching this contract interpretation, the Court considers the Superior Court of Pennsylvania's opinion in Kromer v. Reliance Ins. Co., 677 A.2d 1224, 1230 (Pa. Super. Ct. 1996), aff'd, 696 A.2d 152 (Pa. 1997).  There, the Superior Court of Pennsylvania interpreted a commercial excess liability policy and concluded that, under the policy's plain language, it did not "provide underinsured motorist coverage."  677 A.2d at 1230.  To arrive at its holding, the Superior Court of Pennsylvania considered the policy language at issue and concluded that "[c]overage under the [insured's] excess policies is only triggered by claims of liability against the insured from third parties.  Such coverage is not triggered by claims from first party uninsured motorist coverage."  677 A.2d at 1230.  The Superior Court of Pennsylvania explained:

> Here, the appellee Hoch is obviously the insured.  [The insurance company's] obligation as insurer[] of Hoch, is to pay on the part of Hoch, sums Hoch is legally obligated to pay to third parties.  As the trial court properly concluded "[t]he underinsured motorists claims of [appellants] do not constitute sums which the insured is legally obligated to pay nor are they payments made on behalf of the insured."  Here . . . employees of Hoch, are making a claim for first party underinsured motorist coverage under [a commercial excess policy] . . . when the language of both clearly indicates that no such coverage exist.

677 A.2d at 1230 (first, second, fifth and sixth alterations added, third and fourth alterations original).

While the Hired Auto and Nonowned Auto Liability endorsement "applies to 'bodily injury' and 'property damage' arising out of the maintenance or use of a 'hired auto' or 'nonowned auto,'" the provision excludes bodily injury of Mark's Supply's employees or Mark's Supply's property. Travelers CGL Policy at 21-22. The Hired Auto and Nonowned Auto Liability endorsement provides coverage for the insured's liability to third parties, not coverage for bodily injury and property damage suffered by Mark's Supply or its employees. See Travelers CGL Policy at 21-22. Hence, the Hired Auto and Nonowned Auto Liability endorsement does much the same work as the insurance contract at issue in Kromer v. Reliance Insurance Co.: both provide coverage for losses for which the insured is liable. Compare Travelers CGL Policy at 21-22 (providing coverage for "Hired Auto Liability [and] Nonowned Auto Liability"), with Kromer v. Reliance Insurance Co., 677 A.2d at 1230 ("[I]t is clear from the language of both policies that they provide third party liability coverage only."). As with the insurance contracts that the Superior Court of Pennsylvania considered in Kromer v. Reliance Insurance Co., it is clear from the Hired Auto and Nonowned Auto Liability endorsement's language that the policy provides "third party liability coverage only." 677 A.2d at 1230. See Travelers CGL Policy at 21-22. Like the insurance contracts that the Superior Court of Pennsylvania considered in Kromer v. Reliance Insurance Co., the Hired Auto and Nonowned Auto Liability endorsement does not "express any intention of providing first party underinsured motorist coverage." 677 A.2d at 1230. See Travelers CGL Policy at 21-22. Consequently, the Hired Auto and Nonowned Auto Liability policy provision unambiguously does not include coverage for an insured's injuries that underinsured or uninsured motorists caused; rather, it

supplies coverage for third-party injuries arising out of Mark's Supply's use of nonowned vehicles.  See Travelers CGL Policy at 21-22.  See also Dottery, 43 F. Supp. 2d at 517 (holding, under Pennsylvania law, that a commercial insurance policy did not provide underinsured motorist coverage, because "the language of the policy provides that it is a liability policy").

Next, the Travelers Excess Liability Policy unambiguously does not include underinsured or uninsured motorist coverage.  See Travelers Excess Liability Policy at 8, 11.  In fact, the excess liability policy specifically excludes underinsured or uninsured motorists from its coverage.  See Travelers Excess Liability Policy at 11.  The policy's exclusion provision states: "This insurance does not apply to . . . Uninsured Motorist, Underinsured Motorists, 'Auto' No-Fault . . . .  Any liability imposed on the insured, or the insured's insurer, under any of the following laws: (1) Uninsured Motorist; (2) Underinsured Motorists."  Travelers Excess Liability Policy at 8, 11.  This contract language is dispositive, because where "the language of the contract is clear and unambiguous, a court is required to give effect to that language."  Standard Venetian Blind, 469 A.2d at 566.  Consequently, the Travelers Excess Liability Policy does not include coverage for injuries caused by underinsured or uninsured motorists.    See Travelers CGL Policy at 21-22.

The Anczarskis acknowledge that the excess liability policy expressly excludes uninsured or underinsured motorist coverage; however, they argue that the Hired Auto and Nonowned Auto Liability endorsement in the underlying commercial general liability policy creates "confusion" whether the two Travelers Indemnity policies afford them an uninsured or underinsured motorist claim.  Tr. at 13:15-14:15 (Aragon)("Although it specifically states there is an exclusion there are other provisions in the policy that create confusion as to what is covered under nonowned and owned auto liability.").  The Anczarskis advert to the 2010 Certificate of Liability to support

their argument there is an equivocation regarding whether Travelers Indemnity had provided them with uninsured or underinsured motorist coverage. See Tr. at 18:18-20 (Aragon)(relying on "a certificate of liability insurance policy effective 12/25/2009 to 12/25/2010"). The 2010 Certificate of Liability reflects, however, only the coverages provided by the Travelers CGL Policy and the Travelers Excess Liability, noting that Travelers Indemnity provided coverage for (i) "COMMERCIAL GENERAL LIABILITY," (ii) "HIRED AUTO," (iii) "NON OWNED AUTO," and "EXCESS/UMBRELLA LIABILITY." 2010 Certificate of Liability. The 2010 Certificate of Liability does not afford any indication that Travelers Indemnity provided the Anczarskis with uninsured or underinsured motorist coverage and, resultingly, does not create any genuine issue of material fact regarding the same.

The Anczarskis also rely on John J. Anczarski's Supplemental Answers to support their contention that there is "confusion" whether the two Travelers Indemnity policies afford them an uninsured or underinsured motorist claim. Tr. at 13:15-14:15 (Aragon). See John J. Anczarski's Supplemental Answers ¶ 12, at 3. John J. Anczarski avers "that the reasons that I purchased the insurance coverage would have been based on the assurances from the Traveler's [sic] Indemnity Company that they were providing us with full insurance coverage to include uninsured/underinsured motorist coverage." John J. Anczarski's Supplemental Answers ¶ 12, at 3. John J. Anczarski statement does not, however, create an ambiguity regarding whether the two Travelers Indemnity policies provided the Anczarskis with uninsured or underinsured motorist coverage. Under Pennsylvania law, "[w]hile reasonable expectations of the insured are the focal points in interpreting the contract language of insurance policies, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous." Bubis v. Prudential Property & Cas. Ins. Co., 718 A.2d at 1272

(internal citations omitted).  If "the language of the contract is clear and unambiguous, a court is required to give effect to that language.'"  Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3d Cir. 1994)(quoting Standard Venetian Blind, 469 A.2d at 566 (1983)).  "A provision is ambiguous only if reasonably intelligent persons, considering it in the light of the entire policy, can honestly differ as to its meaning."  Curbee, Ltd. v. Rhubart, 594 A.2d 733, 735 (Pa. Super. Ct. 1991).[11]  Considering the language of the entire Travelers CGL Policy and the entire Travelers Excess Liability Policy, the Court cannot soundly conclude that there are grounds for a reasonable difference regarding whether either policy affords uninsured or underinsured motorist coverage.  See Travelers CGL Policy at 21-22; Travelers Excess

---

[11]The Court notes parenthetically that Pennsylvania's approach to deciding whether a contract is ambiguous differs from the approach that the Supreme Court of New Mexico has adopted.  In United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, 285 P.3d 644, 648, the Supreme Court of New Mexico stated:

> "New Mexico law . . . allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."  Mark V, Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 845 P.2d 1232, 1235.  This general principle of New Mexico contract law has been reaffirmed in the specific context of insurance coverage disputes.  See, e.g., State Farm Mut. Aut. Ins. Co. v. Ponder, 2000-NMSC-033, ¶ 13, 12 P.3d 960 (interpreting provisions of an automobile insurance policy and noting that "[i]n abandoning reliance only on the four-corners approach, courts are now allowed to consider extrinsic evidence in determining whether an ambiguity exists in the first instance, or to resolve any ambiguities that a court may discover").

United Nuclear Corp. v. Allstate Ins. Co., 2012-NMSC-032, ¶ 13, 285 P.3d 644, 648 (alterations original).  See, e.g., Mesa Oil, Inc. v. Ins. Co. of N.A., 123 F.3d 1333, 1340-41 ("New Mexico courts generally allow a party to introduce extrinsic evidence of a[n insurance] contract's meaning to determine whether an ambiguity exists and how that ambiguity should be resolved.")(alterations original).  Pennsylvania case law takes a different tack.  Under Pennsylvania law, "[w]hile reasonable expectations of the insured are the focal points in interpreting the contract language of insurance policies, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous."  Bubis v. Prudential Property & Cas. Ins. Co., 718 A.2d at 1272 (internal citations omitted).  As the Court has explained, Pennsylvania law controls whether the Anczarskis have claims under either Travelers Indemnity insurance contract at issue.  See supra at II.

Liability Policy at 8, 11.  They do not.  See Travelers CGL Policy at 21-22; Travelers Excess Liability Policy at 8, 11.

The policies that Travelers Indemnity issued to the Anczarskis do not betray any confusion or inconsistency.  On the one hand, the Travelers CGL Policy does not provide uninsured or underinsured motorist coverage, because the Hired Auto and Nonowned Auto Liability endorsement's language indicates that the policy provides only third-party liability coverage.  See Travelers CGL Policy at 21-22.  See also Dottery, 43 F. Supp. 2d at 517; Kromer v. Reliance Insurance Co., 677 A.2d at 1230.  On the other hand, the Travelers Excess Liability Policy does not provide uninsured or underinsured motorist coverage, because it expressly says that it does not.  Travelers Excess Liability Policy at 8, 11.  See Standard Venetian Blind, 469 A.2d at 566.  The policies are neither confused nor confusing.

Accordingly, Travelers Indemnity is entitled to summary judgment on the Anczarskis' uninsured or underinsured motorist claim.  Again, to recover on this claim, the Anczarskis must "show [the] claim [is] within the coverage provided by the policy."  Miller v. Boston Ins. Co., 218 A.2d at 277 (alteration added).  See McEwing v. Lititz Mut. Ins. Co., 77 A.3d at 646.  They cannot do so, because there is no genuine issue of material fact regarding whether the two Travelers Indemnity's policies at issue afford such coverage.  See Travelers CGL Policy at 21-22; Travelers Excess Liability Policy at 8, 11.  The policies unambiguously do not include uninsured or underinsured motorist coverage; accordingly, Travelers Indemnity is entitled to summary judgment on the Anczarskis' uninsured or underinsured motorist claim.

B.    **THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND TRAVELERS INDEMNITY IS ENTITLED TO JUDGMENT ON THE ANCZARSKIS' BREACH-OF-CONTRACT CLAIM UNDER PENNSYLVANIA LAW.**

In their Amended Complaint, the Anczarskis also allege a breach-of-contract claim against Travelers Indemnity. See Amended Complaint ¶¶ 12, 25-26, at 3-4. The Anczarskis contend that they "are entitled to recover under the Travelers Indemnity Policy . . . ." Amended Complaint ¶ 25, at 4 (alteration added). They state that they "made a demand . . . and that demand has not been honored." Amended Complaint ¶ 12, at 3 (alteration added). The Anczarskis resultingly concluded that they "are entitled to recover from Defendants the maximum amount recoverable under the respective policies of insurance and Plaintiffs make a claim for such herein." Amended Complaint ¶ 25, at 4. Travelers Indemnity moves for summary judgment on the Anczarskis' breach-of-contract claim, contending that it "did not issue any policy of motor vehicle liability insurance to Plaintiffs that would provide coverage for the death of the Plaintiff's son caused by the negligence of an underinsured motorist." Motion at 1.

There is no genuine dispute of material fact whether either the Travelers CGL Policy or the Travelers Excess Liability Policy obligates Travelers Indemnity to indemnify the Anczarskis for the losses arising from the collision between Waconda and John R. Anczarski. It is undisputed that the injuries for which the Anczarskis seek to recover through their breach-of-contract action arose out of a collision between "a vehicle driven by Gilbert Waconda in Cibola County, New Mexico," and a bicycle that their son rode. Motion ¶ 2, at 4 (stating this fact)(citing Complaint ¶ 4, at 2). See Response at 2 (not disputing this fact). The dispute between the Anczarskis and Travelers Indemnity -- i.e., whether Travelers Indemnity is contractually obligated to indemnify the Anczarskis -- is legal. See Miller v. Boston Ins. Co., 218 A.2d at 277; McEwing v. Lititz Mut. Ins. Co., 77 A.3d at 646. The Supreme Court of

Pennsylvania has stated that "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." Miller v. Boston Ins. Co., 218 A.2d at 277. See McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. Ct. 2013)("In an action arising under an insurance policy, our courts have established a general rule that it is a necessary prerequisite . . . for the insured to show a claim within the coverage provided by the policy.")(alteration original)(internal quotation marks and citation omitted). The Anczarskis cannot "show a claim within the coverage provided" by either the Travelers CGL Policy or the Travelers Excess Liability. Miller v. Boston Ins. Co., 218 A.2d at 277.

The Travelers CGL Policy is a commercial liability policy. See Travelers CGL Policy at 4-6. The Travelers CGL Policy's only provision that provides coverage relating to injuries caused by motor vehicles is the Hired Auto and Non-Owned Auto Liability schedule. See Travelers CGL Policy at 21-22. The Anczarskis assert their breach-of-contract claim under the Hired Auto and Non-Owned Auto Liability schedule. See Tr. at 5:20-23 (Aragon)(alterations added)(arguing that "the provisions indicate that there is at least cover[age] under the bodily injury provision and is insured pursuant to the . . . [non]owned car policy"). That provision does not, however, support the contractual claim that the Anczarskis assert.

The Hired Auto and Non-Owned Auto Liability schedule provides coverage for "'bodily injury' and 'property damage' arising out of the maintenance or the insured's use of a 'hired auto' or 'nonowned auto.'" Travelers CGL Policy at 21. Under the Hired Auto and Nonowned Auto Liability policy schedule, a "hired auto" means any "auto" that the insured leases, hires, rents, or borrows, excluding any auto hired, leased, or rented for a period of 180 days or more, and any auto hired, leased, or rented from an employee, partner, stockholder, or household member. Travelers CGL Policy at 22. A "nonowned auto," in turn, refers to any "autos" that the

insured does not own, lease, hire, rent or borrow that are being used in the course and scope of the insured's business at the time of an occurrence that gives rise to liability, including autos owned by employees, partners, or household members, but only while used in the course and scope at the time of an occurrence giving rise to liability.  Travelers CGL Policy at 22.  The policy schedule also excludes from coverage damage to property owned, transported by, rented or loaned to Mark's Supply, or within their care, custody, or control.  See Travelers CGL Policy at 21.  It additionally excludes from coverage bodily injury to any of the insured's employees arising out of or in the course of employment.  See Travelers CGL Policy at 21.  Accordingly, it is clear that the Hired Auto and Nonowned Auto Liability endorsement provides "third party liability coverage only."  Kromer v. Reliance Insurance Co., 677 A.2d at 1230.  See Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d at 1309 (stating that where "'the language of the contract is clear and unambiguous, a court is required to give effect to that language'")(quoting Standard Venetian Blind, 469 A.2d at 566).

Under the Travelers CGL Policy's language, the Hired Auto and Non-Owned Auto Liability schedule covers Mark's Supply and the Anczarskis if a Mark's Supply employee causes a third party bodily injury or property damage while using a hired or an otherwise non-owned vehicle.  See Travelers CGL Policy at 21-22.  It is undisputed, however, that a vehicle that Waconda negligently operated -- and not any hired or non-owned vehicle that either a Mark's Supply employee or the Anczarskis operated -- struck John R. Anczarski.  Motion ¶ 2, at 4 (stating this fact)(citing Complaint ¶ 4, at 2).  See Response at 2 (not disputing this fact).  See also Tr. at 7:11-15 (Aragon)(explaining that the alleged Mark's Supply vehicle, which is not alleged to be either hired or otherwise non-owned, did not collide with John R. Anczarski).  Further, John R. Anczarski's estate has not filed a claim against Travelers Indemnity's

insureds -- namely, Mark's Supply and the Anczarskis.  See Tr. at 11:15-18 (Court, Eaton); id. at 12:12-13-14 (Court, Eaton).  Accordingly, the Anczarskis cannot "show a claim within the coverage provided by" the Travelers CGL Policy.  Miller v. Boston Ins. Co., 218 A.2d at 277.

Next, the Anczarskis also cannot "show a claim within the coverage provided" by the Travelers Excess Liability Policy.  Miller v. Boston Ins. Co., 218 A.2d at 277.  With respect to auto liability, the Travelers Excess Liability Policy provides that it "applies to 'bodily injury' or 'property damage' arising out of the ownership, operation, . . . or, entrustment to others of any auto that is owned, operated, maintained, used . . . or loaned to any insured . . . ."    Travelers Excess Liability Policy at 6.  The Travelers Excess Liability Policy states that it applies "only if such 'bodily injury' or 'property damage' would be covered by 'underlying insurance' shown in [the] SCHEDULE OF UNDERLYING INSURANCE of the Declarations, or the renewal or replacement of such 'underlying insurance' but for the exhaustion of the applicable limits of insurance of the 'underlying insurance."  Travelers Excess Liability Policy at 20.  The Travelers Excess Liability Policy's "SCHEDULE OF UNDERLYING INSURANCE," in turn, refers only to the Travelers CGL Policy.  Travelers Excess Liability Policy at 2, 6.  Consequently, the Travelers Excess Liability Policy provides excess liability coverage for a loss only if the Travelers CGL Policy also covers part of that loss.  See Travelers Excess Liability Policy at 2, 6, 20.  Because the Travelers CGL Policy does not cover losses arising from John R. Anczarski's collision with the vehicle that Waconda negligently operated, see supra at III.A., the umbrella policy does not cover those loses, see Travelers Excess Liability Policy at 2, 6 & 20.  As a result, the Anczarskis cannot "show a claim within the coverage provided by" the Travelers Excess Liability Policy.  Miller v. Boston Ins. Co., 218 A.2d at 277.  Accordingly, Travelers Indemnity is entitled to summary judgment, because there are no genuine issues of material fact and the

Anczarskis cannot "show a claim within the coverage provided by" either Travelers Indemnity policy at issue. Miller v. Boston Ins. Co., 218 A.2d at 277.

     **IT IS ORDERED** that: (i) the Plaintiffs' Motion to Supplement the Record with Correct Information, filed June 28, 2017 (Doc. 46), is granted; and (ii) the Defendant The Travelers Indemnity Company's Motion for Summary Judgment, filed April 6, 2017 (Doc. 31), is granted.

 

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nicholas Mendoza
Nicholas Mendoza, Attorney at Law
Tijeras, New Mexico

-- and --

Cynthia Aragon
Cynthia Aragon, Attorney at Law, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

P. Scott Eaton
Eaton Law Office PC
Albuquerque, New Mexico

    *Attorneys for the Defendant*